**NATIONAL BANK OF COMMERCE (of El Dorado, Arkansas), Conservator of the Estate (only) of John McDougal, and John McDougal, Individually, Plaintiff,**

v.

**ASSOCIATED MILK PRODUCERS, INC., Defendant.**

No. B–C–96–50.

United States District Court,
E.D. Arkansas,
Northern Division.

June 12, 1998.

Terry F. Wynne, Bridges, Young, Matthews Drake, Pine Bluff, AR, Neal W. Adams, Adams, Lynch, Loftin & S P.C., Bedford, TX, for Associated Milk Producers, Inc., defendant.

## *MEMORANDUM OPINION AND ORDER*

EISELE, District Judge.

Before the Court is defendant Associated Milk Producers, Inc.'s ("AMPI") Motion to Exclude Opinion Testimony of Plaintiff's Experts[1] and defendant's Motion for Summary Judgment. The parties have thoroughly briefed this issue. Furthermore, the Court held a hearing on the issue January 7–13, 1998, at which many of the experts for the parties testified. This testimony supple-

mented the summary judgment submissions previously filed. Thereafter, on January 29, 1998, the Court heard the oral arguments of counsel.

AMPI files its motion to exclude plaintiff, John McDougal's ("plaintiff"), causation experts, contending that their proffered testimony fails to meet the standards set forth in Federal Rules of Evidence 702 and 703, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and its progeny.

AMPI seeks to exclude the testimony of Dr. Jimmie L. Valentine, Dr. Charles Fowler, Dr. Maly Mazumder, Dr. Alex Pappas, Dr. Brad H. Pollock, and Dr. Daniel T. Teitelbaum.[2] These witnesses are being offered to opine regarding several issues crucial to this lawsuit, namely: the occurrence of aflatoxin M–1 (hereinafter "AFM") in milk sold by AMPI during a fifteen month period in 1990 and 1991, whether AFM causes laryngeal cancer in humans, and, if so, at what levels of exposure and dose. Plaintiff asserts he was subjected to AFM-contaminated milk. He contends, first, that under accepted scientific principles, he is not required to prove the dose of AFM to which he was exposed because there is no safe threshold, since one molecule of AFM could cause his cancer under the "one shot" theory. Alternatively, he argues that he has produced sufficient evidence of both his exposure to AFM and the dose he experienced. After exhaustively reviewing the record before it, the Court is ready to rule on defendant's motions. For the reasons set forth in this Memorandum Opinion, the Court will grant defendant's motion to exclude and, as a consequence, it will also have to grant defendant's motion for summary judgment.

## I. BACKGROUND

This diversity case alleges causes of action under Arkansas law based on the tort of outrage, strict liability, breach of implied and express warranties, fear of future conse-

---

1. Docketed as Doc. Nos. 58, 79, and 84.

2. A brief summary of the causation-related testimony of each of the witnesses will be found in

Appendix A attached hereto. Drs. Fowler's and Mazumder's testimony dealt with dose and exposure rather than medical causation.

quences and reckless and culpable negligence. From approximately July 26, 1990 until October 31, 1991, John McDougal worked in the Batesville, Arkansas, cheese manufacturing plant of Hills Valley Foods ("HVF"). HVF is an Arkansas corporation which bought milk from distributors and processed that milk into cheese and cheese curd. AMPI, a Kansas corporation, distributed milk in Arkansas (among other states), and supplied HVF with some of the milk it used to make cheese and curd.

During his employment at HVF, plaintiff worked on the cheese production line and was allowed to consume cheese freely. Besides ingestion, it is undisputed that plaintiff was exposed to some quantity of milk via inhalation of aerosolized milk particles that were produced by the cheese making process. After suffering from hoarseness for approximately six weeks, plaintiff first presented for treatment on February 27, 1995. He was diagnosed as having laryngeal cancer. He then had surgery to remove half of his voice box and vocal cords on March 6, 1995. He subsequently underwent additional surgeries. Plaintiff asserts that, in June of 1995, he learned that certain AMPI employees had pled guilty in federal court to the distribution of, and conspiracy to distribute, contaminated milk in interstate commerce.[3] This was the first notice he had of such contamination.

Plaintiff alleges he developed laryngeal cancer because AMPI provided HVF with AFM-contaminated milk to which he was exposed at his workplace. The tainted milk allegedly was utilized by HVF as a result of the falsification and alteration of test results designed under a regulatory regime to determine the quality of milk. Plaintiff alleges that AMPI redirected to HVF certain shipments of milk that had tested positive for AFM.

AFM is a natural by-product of aflatoxin B-1 ("AFB"), a substance occasionally found in grains, corn, peanuts, and other food products which often are used to feed cattle. When cows consume AFB-contaminated feed, their systems break down the aflatoxin B-1 into the metabolite AFM, which they excrete in their milk. Plaintiff alleges he was exposed to AFM through eating cheese, by inhaling both "dried" and liquid aerosol milk particles produced by the cheese making process at HVF, and by dermal exposure. Plaintiff has named AMPI as the only defendant in this lawsuit. Although plaintiff earlier relied on the opinion that his laryngeal cancer was caused by his exposure to aflatoxin through his eating of aflatoxin-tainted cheese, it is now clear that he is relying upon the theory that aflatoxin inhaled in aerosol form was the cause of his cancer. In any event, plaintiff does not now rely upon any expert opinion that his exposure to aflatoxin through his skin or from eating or drinking contaminated cheese or milk caused his laryngeal cancer. However, he does still contend that his eating of contaminated cheese forms a legal basis for his fear of future cancer such as hepatic (liver) cancer.

Defendant filed its motion to exclude plaintiff's experts' causation testimony, asserting that the testimony fails to meet *Daubert*'s admissibility requirements. Prior to the January 7, 1998 hearing on the issue, AMPI contended that plaintiff's experts' testimony did not constitute "scientific knowledge" and that their theories and methodologies had no general acceptance in the scientific community. AMPI argued that plaintiff must, but cannot, establish: (1) the level of exposure to AFM that is hazardous to human beings generally; (2) that such level of exposure causes the type of injury (laryngeal cancer) of which plaintiff complains; and (3) that John McDougal was exposed while working at HVF to such level of AFM from the milk sold by AMPI to Hills Valley Farms. Quoting *Cavallo v. Star Enter.*, 892 F.Supp. 756 (E.D.Va.1995), defendant has maintained prior to, and after, the *Daubert* hearing that "toxicity is a function of dose. Thus, the question for causation purposes is: At what

---

**3.** AMPI employees Jerry Moore, Larry Miller, Jerry Griggs, and Darrell Williams entered guilty pleas to various charges. Those charges included conspiracy, shipping adulterated milk and milk products in interstate commerce, and mail fraud. A review of the indictments and informations demonstrates that the criminal charges alleged that certain loads were "adulterated." The adulterated loads were alleged to contain beta lactams, sulfa, tetracyclines, and aflatoxins.

levels of exposure do what kinds of harm occur?" After the hearing on this issue, the Court is convinced that it must conduct a two pronged analysis.

First, the cornerstone issue is whether plaintiff may proceed under a "no-threshold" or "one-hit" theory (hereinafter "no-threshold"). Under a no-threshold approach, plaintiff's experts maintain that there exists no safe level of exposure to genotoxins in general, and AFM in particular. Consequently, they posit that exposure to as little as one molecule of aflatoxin can produce alterations in genetic material leading to cancer. Defendant argues this approach fails to meet the *Daubert* admissibility standard even if the underlying scientific, biologic theory has acceptance. *See* discussion below.

Alternatively, if the Court rejects the no-threshold theory, the inquiry turns to whether AFM causes laryngeal cancer in humans, and if so at what dose. If plaintiff has admissible evidence on those issues, the question becomes whether Mr. McDougal was subjected to a sufficient dosage to have caused his laryngeal cancer. Defendant's argument is: "It is simply that there is not evidence in any medical literature or studies that aflatoxin (and particularly aflatoxin M–1 which is the metabolite to which Mr. McDougal was allegedly exposed) causes laryngeal cancer such as Mr. McDougal had. They also fail to prove, even if aflatoxin M–1 were assumed to cause laryngeal cancer, the level of exposure at which it would do so or the level of Mr. McDougal's exposure."

## II. DISCUSSION

### A. *The Daubert Standard*

Of course, *Daubert* provides the starting point when a district court undertakes its "gatekeeper role" in determining the admissibility of proffered scientific testimony. This Court provided an extended presentation of what Justice Blackman's opinion requires of trial courts in *National Bank of Commerce v. Dow Chemical Co.*, 965 F.Supp. 1490 (E.D.Ark.1996), *aff'd* 133 F.3d 1132 (8th Cir.1998). The Court quotes extensively from its opinion in that case in order to put its analysis of the evidence in its doctrinal context:

We start with Justice Blackmun's opinion in *Daubert.* After concluding that the *Frye* Rule ("that austere standard") should not be applied in federal trials, *Daubert*, 509 U.S. at 589, 113 S.Ct. at 2794, Justice Blackmun went on to discuss the proper test for admissibility of scientific evidence. He pointed out that Rule 702 nowhere refers to the "general acceptance" test of *Frye*. He then explained as follows:

That the *Frye* test was displaced by the Rules of Evidence does not mean, however, that the Rules themselves place no limits on the admissibility of purportedly scientific evidence. Nor is the trial judge disabled from screening such evidence. To the contrary, under the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.

The primary locus of this obligation is Rule 702, which clearly contemplates some degree of regulation of the subjects and theories about which an expert may testify. *"If scientific*, technical, or other specialized *knowledge will assist the trier of fact* to understand the evidence or to determine a fact in issue" an expert "may testify *thereto.*" The subject of an expert's testimony must be "scientific ... knowledge." The adjective "scientific" implies a grounding in the methods and procedures of science. Similarly, the word "knowledge" connotes more than subjective belief or unsupported speculation. The term "applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds." Webster's Third New International Dictionary 1252 (1986). Of course, it would be unreasonable to conclude that the subject to scientific testimony must be "known" to a certainty; arguably, there are no certainties in science.

\* \* \* \* \* \*

But, in order to qualify as "scientific knowledge," an inference or assertion

must be derived by the scientific method. Proposed testimony must be supported by appropriate validation—*i.e.,* "good grounds," based on what is known. In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability.

*Daubert,* 509 U.S. at 589–90, 113 S.Ct. at 2794–95 (emphasis in original). It is important also to consider Justice Blackmun's footnote to this observation:

We note that scientists typically distinguish between "validity" (does the principle support what it purports to show?) and "reliability" (does application of the principle produce consistent results?).

\* \* \* \* \* \*

... our reference here is to *evidentiary* reliability—that is, trustworthiness.

\* \* \* \* \* \*

In a case involving scientific evidence, *evidentiary reliability* will be based upon *scientific validity.*

*Id.* at n. 9. The majority opinion then goes on to state that:

Rule 702 further requires that the evidence or testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." This condition goes primarily to relevance. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."

\* \* \* \* \* \*

Rule 702's "helpfulness" standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.

That these requirements are embodied in Rule 702 is non surprising. Unlike an ordinary witness, see Rule 701, an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation. See Rules 702 and 703. Presumably, this relaxation of the usual requirement of first-hand knowledge—a rule which represents "a 'most pervasive manifestation' of the common law insis-

tence upon 'the most reliable sources of information.'" Advisory Committee's Notes on Fed.Rule Evid. 602 (citation omitted)—is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline.

*Daubert,* 509 U.S. at 591–92, 113 S.Ct. at 2796.

With this doctrinal background in mind, Justice Blackmun then provides the trial judge with practical instructions on how to proceed when expert scientific testimony is challenged:

Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether the reasoning or methodology properly can be applied to the facts in issue. We are confident that federal judges possess the capacity to undertake this review. Many factors will bear on the inquiry, and we do not presume to set out a definitive checklist or test. But some general observations are appropriate.

Ordinarily, a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested. "Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry." *Green* at 645. See also C. Hempel, *Philosophy of Natural Science* 49 (1966) ("[T]he statements constituting a scientific explanation must be capable of empirical test"); K. Popper. *Conjectures and Refutations: The Growth of Scientific Knowledge* 37 (5th Ed.1989) ("[T]he criterion of the scientific status of a the-

ory is its falsifiability, or refutability, or testability").

Another pertinent consideration is whether the theory or technique has been subjected to peer review and publication. Publication (which is but one element of peer review) is not a *sine qua non* admissibility; it does not necessarily correlate with reliability, see S. Jasanoff. *The fifth Branch: Science Advisors as Policymakers* 61–76 (1990), and in some instances well-grounded but innovative theories will not have been published, see Horrobin, *The Philosophical Basis of Peer Review and the Suppression of Innovation*, 263 *J.Am.Med. Assn.* 1438 (1990). Some propositions, moreover, are too particular, too new, or of too limited interest to be published. But submission to the scrutiny of the scientific community is a component of "good science," in part because it increases the likelihood that substantive flaws in methodology will be detected. See J. Siman, *Reliable Knowledge: An Exploration of the Grounds of Belief in Science* 130–133 (1978); Relman and Angell, *How Good Is Peer Review?*, 321 *New Eng.J.Med* . 827 (1989). The fact of publication (or lack thereof) in a peer-reviewed journal thus will be relevant, though not dispositive, consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is premised.

Additionally, in the case of particular scientific technique, the court ordinarily should consider the known or potential rate of error, see, *e.g.*, *United States v. Smith*, 869 F.2d 348, 353–354 (7th Cir. 1989) (surveying studies of the error rate of spectrographic voice identification technique), and the existence and maintenance of standards controlling the technique's operation. See *United States v. Williams*, 583 F.2d 1194, 1198 (2d Cir.1978) (noting professional organization's standard governing spectrographic analysis), *cert. denied*, 439 U.S. 1117, 99 S.Ct. 1025, 59 L.Ed.2d 77 (1979).

Finally, "general acceptance" can yet have a bearing on the inquiry. A "reliability assessment does not require, although it does permit, explicit identification of a relevant scientific community and an express determination of a particular degree of acceptance within that community." *United States v. Downing*, 753 F.2d at 1238. See also 3 Weinstein & Berger ¶ 702[03], pp. 702–41 to 702–42. Widespread acceptance can be an important factor in ruling particular evidence admissible, and "a known technique that has been able to attract only minimal support within the community," *Downing, supra*, at 1238, may properly be viewed with skepticism.

The inquiry envisioned by Rule 702 is, we emphasize, a flexible one. Its overarching subject is the scientific validity—and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.

*Daubert*, 509 U.S. at 592–95, 113 S.Ct. at 2796–97. The *Daubert* opinion also instructs the trial judge to be mindful of the provisions of Rules 703, 706 and 403. Finally, the trial judge is admonished that if she or he concludes that a scintilla of evidence supporting a position is insufficient to allow a reasonable jury to conclude that the position is more likely than not true, the court remains free to direct a judgement, *see* Fed.Rule Civ.Proc. 50(a), and likewise to grant summary judgment, Fed. Rule Civ.Proc. 56. This is to remind us that scientific evidence may raise questions not only as to admissibility but also as to sufficiency. It is interesting to note that Justice Blackmun cites the case of *Brock v. Merrell Dow Pharmaceuticals, Inc.*, 874 F.2d 307 (5th Cir.1989), *modified*, 884 F.2d 166 (5th Cir.1989), in support of this proposition. In summary, Justice Blackmun states that the rules of evidence (especially Rule 702).

... do assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. Pertinent

evidence based on scientifically valid principles will satisfy those demands. *Daubert,* 113 S.Ct. at 2799.

*Daubert* holds that admissibility under Rule 702 is governed by Rule 104(a), which requires the judge to conduct "preliminary fact-finding, to make a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 2796. Thus, before admitting scientific evidence, the Court must, *inter alia,* determine whether the theory advanced by the expert has been subjected to the "scientific method." *Id.* at 2795, 2797. And the focus of this inquiry must be on "principles and methodology, not on the conclusions that they generate." *Daubert,* at 2797.

"Scientific validity" and "fit" inquiries may overlap. For example, if published theories and studies purport to prove A, yet from those studies an expert concludes B, it may be that the expert's reasoning process is not valid, although the studies or theories she relies upon are. In sum, there may be a lack of "fit" between the studies and theories and the conclusion the expert draws from them.

Each step of the experts' methodology must be scientifically valid. *See In re Paoli R.R. Yard PCB Litigation,* 35 F.3d 717, 745 (3d Cir.1994). For example, in a situation where an expert relies on studies of the effects of animal exposure to a particular chemical to prove similar effects in humans, "[c]ourts must assess the scientific validity of the hypothesis proffered to justify such an extrapolation." *Developments in the Law—Confronting the New Challenges of Scientific Evidence,* 108 Harv.L.Rev. 1481, 1536 (1995).'

*National Bank of Commerce v. Dow,* 965 F.Supp. at 1493–96.

■ Whether proceeding on a negligence or strict liability theory, a plaintiff in a toxic tort case must, under Arkansas law, establish medical causation through expert testimony. *See Southern Co., Inc. v. Graham,* 271 Ark.

223, 607 S.W.2d 677, 679 (1980) and 327 Ark. 367, 937 S.W.2d 183 (1997). Under *Wright v. Willamette Indus., Inc.* ., 91 F.3d 1105 (8th Cir.1996), a plaintiff must show proximate causation and, among other things, that it is more likely so than not so that another party has caused him harm. It is not enough to show that a suspect chemical agent sometimes causes the kind of harm complained of. This Eighth Circuit precedent arguably negates plaintiff's "no threshold" theory. Nevertheless, the Court will deal with that theory upon the hypothesis that it is not entirely foreclosed by *Wright.*

The Supreme Court recently reaffirmed the importance of the district court's gatekeeper role in *General Electric v. Joiner,* —— U.S. ——, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). There, the Supreme Court addressed the standard of review in cases which hinge on a *Daubert* analysis. In *Joiner* the District Court excluded under *Daubert* the plaintiff's proffered expert testimony. *Id.* at 516. Applying a "particularly stringent standard of review to the trial judge's exclusion of expert testimony," the Eleventh Circuit reversed the trial court's decision. *Id.* The Supreme Court then reversed the Eleventh Circuit's decision holding that "abuse of discretion," the standard applicable to evidentiary rulings, is the proper standard by which an appellate court reviews a district court's decision to admit or exclude expert opinion testimony after a *Daubert* hearing. The Supreme Court held that the trial court did not abuse its discretion and, therefore, reversed the Court of Appeals' decision. *Id.* at 517–18.

While this Court appreciates the Supreme Court's vote of confidence in the ability of United States District Judges to discharge their duties under *Daubert,* it would nonetheless welcome the critical appellate review of its decisions in this complex, difficult, and developing area of the law. This is particularly so when the trial court's rejection of a plaintiff's proffered scientific causation evidence results in the dismissal of the lawsuit, i.e., is outcome determinative, thus raising Seventh Amendment concerns.[4]

***

**4.** If a federal evidentiary rule results in dismissal

where the state evidentiary rule would not, then,

## B. Cancer—A Genetic Disease

A brief description of cancer as a disease and its usual development stages is necessary. The Court will utilize the testimony of one of the plaintiff's experts for this purpose.

Dr. Teitelbaum testified (as set forth in the textbook *Molecular Oncology* ) that cancer is a genetic disease. He states that "it is the sequence of genetic events which occur, plus those epigenetic; that is, non-genetic but promotional events which occur in the right order which ultimately result in the development of cancer as a clinical disease." (Tr. Vol. 2, p. 25 *Daubert* hearing). He states that "without the genetic changes, you don't have cancer." *Id.*, p. 26. But, he acknowledges that some people have an "innate defect which pre-programs them to cancer," and that there may be cancers which are purely genetic. *Id.*

Dr. Teitelbaum drew a distinction between carcinogens that are mutagens and those that are promoters. Human carcinogens that are mutagens include x-rays, aflatoxin, and PAHs in tobacco. On the other hand, estrogen in breast cancer probably results from its promoter activity on breast tissue. So he distinguishes genotoxic carcinogens, those which directly affect the DNA, from epigenesis or promotional carcinogens, which change the growth patterns without necessarily changing the DNA. Aflatoxin is a mutagen genotoxic carcinogen.

Dr. Teitlabaum's testimony on the development of cancers is informative:

> That's correct. And the whole process of development of cancer is an orderly progression from a normal cell to an initiated cell; the initiated cell has had a genetic hit. It is primed and ready to become cancer, but unless something further happens to it, it will not become cancer. That initiated cell takes further hits, and each of those hits moves the disease along. Ultimately enough hits are accumulated so that the cell possesses all the characteristics that we would call a cancer, capacity to invade

other tissues, the capacity to produce its own blood supply, the capacity to break off and metastasize and set up shop in another tissue. Each of those characteristics requires a genetic hit. It requires a fundamental change in what is basically an ordinary process. That is, the growth of cells is ordinarily, under ordinary circumstances, we have billions of cells. They behave properly most of the time. One cell becomes a rogue because it has had a series of hits, a series of promotional events, it becomes cancer. Now, as each of these hits takes place and the cell multiplies, the target for the next hit is larger. And therefore each successive hit is far more probable than the early hit, which is why cancer tends to be a disease of older persons who have had a whole series of events which have taken place in their lives which permit the aging of the cell.

Tr. Vol. 2, at 30–31.

Dr. Teitlebaum also explained, "DNA adducts" and epoxides:

> Now, we've gotten very much smarter in that we can do molecular studies. In this case there's been all kinds of discussion about DNA adducts and so on. The DNA adduct is absolute evidence of an interaction between DNA and the carcinogen. If you are able to do that, typically if you do that, let's say, with ethylene oxide, we can show that ethylene oxide binds to DNA. The patient doesn't have cancer, but the patient clearly has had a DNA impact. That could have been done. Some of that work has been done, in fact, at the University of Arkansas on DNA adducts for various materials. In animals, DNA adducts for aflatoxin have been shown in tracheal tissue and nasal tissue and laryngeal tissue.

THE COURT: Technically, what does that mean? You take the ordinary DNA—

A. Right.

under *Erie,* the evidentiary ruling might be considered substantive rather than procedural. If so considered, then the federal court would have to apply the state evidentiary rule in a diversity case such as this. But Arkansas cases follow *Dau-* *bert* 's reliability inquiry. *See Moore v. State,* 323 Ark. 529, 544–47, 915 S.W.2d 284, 292–94 (1996); *Prater v. State,* 307 Ark. 180, 820 S.W.2d 429 (1991). Therefore, we are not required to face that problem here.

THE COURT: And now you look at it again after this event. And what do we observe?

A. What you now observe is that attached to the DNA is a metabolite of the chemical compound which you give. Now, again, in this case there's been a lot of discussion about the activation of aflatoxin. Aflatoxin per se is not the problem. Activated aflatoxin is the problem.

BY MR. DAVIDSON:

Q. That's the epoxide?

A. That's the epoxide. Epoxides are extraordinarily reactive. Because of the presence of the oxygen with the rather unstable bond, it is possible for that substance to bind to many large molecules. Some of what it does when it binds is to kill the liver cells. We know that aflatoxin causes toxic hepatitis and will kill in humans and in animals. We also know that the activated aflatoxin, whether it is B1 or M1, can bind to DNA and can cause cancer in animals.

Now, we know that the tissues of interest in this case, upper airway tissues, squamous epithelium in the larynx, squamous epithelium in the nose, have been looked at both in animals and in humans for their capacity to activate carcinogens. And they do activate carcinogens, very actively. As I say, some of that work was done here in Arkansas. So you take a normal cell. You add the carcinogen. The cell activates it. You may not, looking at that cell under the microscope, be able to tell that anything has happened. But if you go to a process like autoradiograpy, which shows where the binding has taken place by having a radioactive molecule now incorporated in the DNA, you can show the carcinogen has, in fact, affected the DNA. That's been shown with aflatoxin, with all of the aflatoxins that we are talking about, M1 and B1.

\* \* \* \* \* \*

THE COURT: And there won't be any cancer from a known carcinogen unless that particular tissue has the epoxide that will activate it?

A. It not only has to have the epoxide, but it also has to go through this. The cell cannot die as a result of it. It has to multiply and be able to live the rest of the way. Otherwise, you don't get cancer.

THE COURT: Are each and every one of these epoxides specific to the specific carcinogen; in other words, or if you have the epoxide in the larynx tissue, any carcinogen will activate?

A. You can't say any carcinogen because there are a whole series of monooxygenases, some of which work on particular structures. But it appears that the capacity to active aflatoxin does exist in upper airway tissues.

Tr. Vol. 2, at 35–37.

Next we turn to a closer look at the particular disease at issue here: laryngeal cancer.

### C. Larynx Cancer in Humans

Plaintiff's expert, Dr. Daniel T. Teitelbaum, testified that approximately seventy-five to ninety percent of the larynx cancers in humans are caused by smoking tobacco. Other potential causes he listed include metal working fluids, rayon, alcohol, asbestos, and substances common to the rubber industry. Even though smoking tobacco is recognized as the major cause of laryngeal cancer, it appears that there have been no studies indicating whether second hand or "side stream" tobacco smoke has been associated with that form of cancer. Since there have been no confirmatory studies showing that the inhalation of second hand or sidestream tobacco smoke causes laryngeal cancer, Dr. Teitelbaum would rule it out here even though there was evidence that Mr. McDougal was exposed to such tobacco smoke and even though the actual smoking of tobacco is known to cause 75% to 90% of all laryngeal cancers. *See infra.* Dr. Teitelbaum also stated that certain allergies may have a co-carcinogenic effect with other substances, a factor which he did not rule out in plaintiff's case. *See* discussion below.

After receiving and reviewing all the parties' submissions, testimony, and argument, the Court finds that there is no scientific literature drawing a direct connection between the inhalation of vapors containing

AFM (or any other exposure to AFM) and the occurrence of laryngeal cancer in humans. Neither party has proffered any study, experiment, or other publication in which *any* exposure to AFM was found to cause laryngeal cancer in humans. Moreover, there is no scientific evidence showing that the much more potent aflatoxin B–1 causes larynx cancer in humans. Where there is no direct scientific knowledge that a particular substance causes a particular form of cancer in humans, experts must turn to epidemiological studies, *in vitro* studies, animal studies, and other indirect methods in an attempt to make the connection.[5] Here, there are no such studies in which AFM or AFB have been shown to cause cancer of the larynx. (*See* discussion, *infra* ). These findings and conclusions are enough to sustain plaintiff's *Daubert* causation motion, but the draconic consequences of such a ruling (dismissal of the case) counsel more discussion.

### D. Aflatoxins—A review of the history of their study and an assessment of the status of our current knowledge.

It is the Court's opinion that the *Daubert* issues presented in this case cannot be adequately dealt with absent an understanding of aflatoxins.

Dr. Frances Ann Draughon, Professor of Food Microbiology and Toxicology in the Department of Food Science and Technology at the University of Tennessee, impressed the Court as the most knowledgeable expert in this case on the subject of aflatoxins. She is one of the defendant's experts.

Dr. Draughon joined the faculty at the University of Tennessee in 1979 immediately upon receiving her doctorate degree from the University of Georgia. She currently teaches food microbiology lecture and lab, advanced microbiology and food toxicology. She is a member of the faculty of Biotechnology and serves as a committee member on the University's Environmental Toxicology Program.

Dr. Draughon has won several awards for her research work. Her research has dealt with mycotoxins (mold toxins) since 1973 and her primary study has been with aflatoxins. She has also authored numerous publications on other mycotoxins. Her current research is aimed at reducing aflatoxin levels in foods and feeds through biodegradation or bioremediation using enzymes obtained from various organisms. She considers her primary expertise to be in aflatoxins and food safety.

From Dr. Draughon's report of September 17, 1997, entitled "Aflatoxins in Milk and Other Foods, Biological Activity, Occurrence and Regulation," and from her testimony in this proceeding the Court has obtained an immense amount of information concerning aflatoxins, most of which is not challenged by plaintiff.

The "afla" portion of the word aflatoxin comes from the name of the organism *Aspergillus Flavus* which was found to produce toxins in feedstuffs in the early 1960's. In 1960 over 500 poultry farms in the United Kingdom lost over 100,000 turkey poults due to a mysterious disease called turkey "X" disease. The disease was quickly linked to peanut meal used in the feeds on those farms. A toxic chemical compound was isolated from the Aspergillus Flavus mold in the peanut meal. It was named aflatoxin and designated B–1 because of the blue fluorescence of the chemical.

Over the years studies have revealed that there are hundreds of naturally occurring toxins which are produced by the growth of mold on foods and feeds. However, only a few have been extensively studied. According to Dr. Draughon, aflatoxins are the most widely studied of the mycotoxins. She states that over 5,000 research papers have been published on the occurrence, analysis, toxicity, mutagenicity and carcinogenicity of aflatoxins. Much progress has been made in the understanding of these properties of aflatoxins and also of their "target organs" and the biosynthesis of such compounds.

---

5. For an extensive review of the various types of evidence which might support expert causation testimony see *National Bank of Commerce v. Dow Chemical*, 965 F.Supp. at pp. 1507–8. There the

Court also discussed the "Signature Disease Theory" an example of which is Mesothelioma which is almost always caused by exposure to asbestos fibers. *See id.* at 1513.

According to Dr. Draughon the term "aflatoxins" refers to 18 different aflatoxins which are produced by the molds *A.flavus, A.parasiticus* or *A.nominus* or which are metabolites thereof or detoxification products.

In this case we are dealing with aflatoxin M–1, a metabolite produced through animal metabolism from aflatoxin B–1. In her report, Dr. Draughon illustrates the differences in the chemical structures of these toxins. Although the structure activity relationship provides a method of predicting toxicity in new chemicals, that approach has serious limitations. As an example, she notes that benzene and toluene and ethel benzene have similar structure activity relationships. Nevertheless, benzene is highly associated with leukemia whereas the other two are not. She states that a similar situation exists with aflatoxins. "Some are highly toxic and carcinogenic, others are not. Fortunately, we do not have to 'guess' as to their mutagenicity since aflatoxins are not 'new' chemicals and extensive toxicity and mutagenicity testing have been done to determine which are most hazardous." *Id.* at 4. She goes on to state, "since some aflatoxins are extremely toxic and/or carcinogenic and others have no toxicity or carcinogenicity it is important to distinguish as to which aflatoxin is being referred to when we discuss aflatoxins." *Id.* at 4. She sets forth a chart which shows the relative mutagenicity of some twelve aflatoxins ranging from 100 for aflatoxin B–1 to 0 for aflatoxin G–2a. According to the Ames test aflatoxin M–1, with which we are here concerned, is given a relative mutagenicity of 3. This would indicate that aflatoxin M–1 has only about 3% of the mutagenicity and carcinogenicity potential of aflatoxin B–1. Other documents and experts have placed the relative mutagenicity of AFM when compared to AFB as being in the range of 31 to 10%.

It is important to understand the history of the effort of governmental agencies to regulate aflatoxins. In 1965 the FDA under the Food, Drug and Cosmetic Act established an information action level of 30 ppb for peanuts. Since then it has established action levels for aflatoxins in a variety of food products. Today the action level for aflatoxin M–1 for milk is 0.5ppb. Ten ppb has been established for aflatoxin B–1, B–2, G–1 and G–2 for all foods except milk and for the feed for dairy cattle. The Action Level for feed for dairy cattle is twenty ppb.

AFM is produced by dairy cows that eat food contaminated with AFB. A relationship can be seen between the action level (20 ppb) for AFB in the feed for dairy cows and the 0.5 ppb for AFM in milk. Studies have revealed that approximately 1% of the AFB in the feed consumed by dairy cows is converted to AFM in their milk. Using a 1% conversion it can be seen that a cow which consumes 50 ppb AFB over all in her feed will produce approximately 0.5ppb AFM in her milk. Therefore, if a cow consumes 20 ppb AFB, (the action level for dairy cow feed) then only approximately 0.2 ppb AFM will be found in her milk, a concentration considerably lower than FDA action level of 0.5 ppb.

Dr. Draughon observes:

Since the FDA Action Levels for aflatoxin B1 in other human foods is 20 ppb, some scientists consider the cow as a filter for removing 99% of the more hazardous aflatoxin B1 from corn and other cereals and therefore milk is considered to be a much safer product than grains and oilseeds (Bodine and Mertens, 1989). The very conservative level of 0.5 ppb aflatoxin M1 in milk was established because (1) milk can constitute the major nutrient of the rapidly growing young, (2) the rapidly growing young are theoretically at the most vulnerable stage of induction of carcinogenesis and (3) in the absence of firm knowledge on the degree of risk, exposure to "unavoidable" carcinogens should be kept to the lowest level practically achievable (Stoloff, 1980).

*Id.* at 9.

In establishing regulatory "action levels," responsible governmental agencies attempt to determine the level in the diet (of the substance under investigation) below which it would only constitute a "negligible risk." According to Dr. Draughon:

The term "negligible risk" is defined by FDA as one excess cancer above background per million persons exposed using conservative (the highest possible) risk as-

sessment model (Winter and Francis, 1997). When regulatory levels of natural toxins are established in foods, these are termed "Action Levels" rather than safe levels or other nomenclature. It should be pointed out that the FDA is not bound to prosecute by these action levels and that exemptions can and have been made when necessary under emergency circumstances. Action levels may be raised or lowered as deemed appropriate by the FDA depending on environmental conditions.

*Id.* 8. Plaintiff's expert Dr. Teitelbaum has served on an OSHA advisory panel. His testimony tends to confirm Dr. Draughon's analysis of regulatory action levels. *See* his testimony in Volume 2, *Daubert* hearing, pp. 42–48.

The greatest aflatoxin production occurs in those years which combine serious droughts followed by very rainy harvest seasons. Historically, three of the worst years, since records have been maintained, were 1977, 1978 and 1980.

Dr. Draughon notes the many food products in which aflatoxins are found:

Aflatoxins are found in numerous food products such as milk and dairy products (Blanco et al., 1989, Galvano et al, 1996); corn and other cereals (Shotwell, et al., 1973); peanuts, tree nuts, cottonseed and other oil seeds, Brazil nuts, coffee beans, pistachio, sunflower seeds and numerous tree nuts and animal feeds (Gelda and Luyt, 1977); health foods (Mislivic et al., 1979);. Aflatoxins can also be produced on cheese, fermented meats, and numerous other food products such as coffee, spices, etc. (Draughon, 1979). Aflatoxins have also been found in paprika, nutmeg, pistachio, cayenne pepper, chili powder, black pepper, sorghum, cassava, wheat, barley and tissues of pigs, beef cattle and poultry (Nakazato, et al., 1991). Aflatoxin are highly stable to heat and are not removed by cooking the food.

*Id.* at 8.

When one checks to determine the effect of AFB on humans it is natural to study its effect on those persons who work in a situation in which they are continuously, or often, exposed to airborne dusts containing such aflatoxin. Dr. Draughon states in her report:

Agricultural workers may be exposed to aflatoxin contaminated spores in the transferring, harvesting, grinding, feeding and handling of contaminated corn or other grains or oilseeds. The effects on agricultural workers in the United States are not known, however, a number of small epidemiological studies in other countries (Hayes et al, 1984) have shown that breathing mold dust during grain or peanut handling is potentially a problem and that it deserves further investigation in the United States.

\* \* \* \* \* \*

Studies have been conducted on airborne dust generated from corn contaminated with A. flavus in the United States and several epidemiology studies in the Netherlands have shown a potential hazard of increased liver cancer after inhalation of aflatoxin B1 contaminated dusts (Hayes et al, 1984). Airborne levels of aflatoxin B1 in 1980 (one of the high aflatoxin years) in a grinding and feeding operation in the United States ranged from 1,200 to 43,200 ng/g or 183 to 1760 ng aflatoxin B1 per cubic meter of air (Drake et al, 1976). An excellent study by Hill et al. (1984) on viable fungi (mold) in dust showed that over 90% of the aflatoxin B1 detected in dusty air at a grain elevator was in the fraction containing conidia (spores) and live fungi.

Caution must be used in trying to compare respiratory exposure of workers in a dirty dusty environment such as feedmill where aflatoxin B1 is present in the air primarily in mold spores and mycelia at levels as high as 42,000 ppb to a dairy plant environment where the only source of aflatoxin is as a chemical metabolite (aflatoxin M1) found at low levels (generally 0.05ppb) in the milk. Not only are the two chemicals (aflatoxin B1 and M1) very different, but the levels of exposure and potential carcinogenicity are extraordinarily different (Stoloff, 1980)

*Id.* at 11.

The highest levels of aflatoxin B–1 have been found in peanuts, cottonseed and corn.

According to Dr. Draughon, "these levels may range as high as 740,000 ppb Aflatoxin B–1 in one peanut and 207,000 ppb Aflatoxin in B–1 in a small kernel of corn.... A study of peanut butter from 1982–1989 revealed that 9.8% of 2510 market basket samples exceeded the FDA Action Level of 20ppb. Of these 8.6% were between 20 and 50ppb, 3.7% were between 50 and 100 ppb, and 2.2% were above 100 ppb." *Id.* at 12. This background information has not been challenged.

What evidence exists that AFB is a human carcinogen? To answer this question Dr. Draughon reviews studies conducted on a variety of animals. The Court sets out her review in considerable detail:

Aflatoxin B1 has been tested on almost all domestic animals, trout and common and uncommon laboratory animals including rhesus monkeys (Adamson et al, 1973). Even the lowly cockroach has not been spared (they are resistant). The common target organ of all species has been repeatedly shown to be the liver and bile duct (Van Rensburg et al, 1985; Wang et al, 1996; Zarba et al, 1992; Linsell, 1977). Since the majority of the metabolized Aflatoxin B1 (in the form of aflatoxin P1, Q1 and M1) (Cast 1989) is excreted through the kidney (as urine) and through the colon (as feces), it is not surprising that aflatoxin B1 has also been shown to cause toxicity or carcinogenicity to the colon and kidney.

\*　\*　\*　\*　\*　\*

Kidney and colon tumors have been reported along with liver tumors in animals given high levels of aflatoxin B1.

\*　\*　\*　\*　\*　\*

Work since [1980] then has confirmed that aflatoxin B1 is a potent liver carcinogen primarily due to the manner in which it is metabolized in the liver to the epoxide form (Bujons et al, 1995, Busby and Wogan, 1984). My own studies with *Salmonella typhimurium* in the Ames test system clearly showed the mutagenicity of aflatoxin B1 but only when a liver enzyme fraction was added to metabolize the aflatoxin to the epoxide or active form (Draughon, 1982). Without metabolism of aflatoxin B1 to the epoxide by the mixed function oxi-

dase enzymes of the liver, aflatoxin B1 has little or no mutagenicity in "in vitro" studies.

Levels of aflatoxin B1 in the diet of test animals are generally in the 0.25 to 2 mg/kg (ppm) range to induce liver carcinoma. However, trout are much more sensitive and pale livers and liver tumors have been seen at 15 ppb aflatoxin B1 in the diet (Busby and Wogan, 1980). The scientific literature clearly shows that aflatoxin B1 causes toxicity, mutagenicity and hepatocarcinogenicity in a number of animal models and toxicity and mutagenicity in various cell culture lines (Feuell, 1966; Wogan, 2967; Adamson, 1973; Peers and Linsell, 1973; Shibahara, et al, 1995).

Aflatoxin B1 has been shown to be a hepatocarcinogen in rats at levels of 70 ng per dose over a two week period (total dose 0.63 mg). The target organ has been clearly shown to be the liver where most of the metabolism of aflatoxin B1 takes place. Other changes seen in the liver of animals exposed to aflatoxin B1 include focal lipid, hyperplasia, transitional cells (preneoplasic) and hepatocellular carcinoma (Wogan et al., 1971).

Numerous epidemiological studies have been conducted in other countries on aflatoxin B1 contaminated foods and invariably the major target organ has been the liver (Dvorackova, 1977; Peers, 1977; Butler and Neal, 1977) Although a positive correlation has been seen between aflatoxin B1 exposure and liver cancer in African and Asian populations, there is no evidence that aflatoxins contribute similarly to liver cancer incidence in the United States (CAST, 1989). Unlike Africa and Asia the incidence of liver cancer in the United States is relatively low. Although people in the Southeastern United States tend to have a higher dietary consumption of aflatoxin B1 than the other parts of the United States (7 ppb vs. 3ppb), no correlation between the increased level of aflatoxin in their diet and liver cancer can be found (CAST, 1989). The CAST report emphasizes that our current system of aflatoxin monitoring and control must be maintained

to assure that exposure to aflatoxin remains low in the United States.

Levels of aflatoxin B1 consumed in various parts of Africa and Asia have shown a direct correlation between consumption of large amounts of aflatoxin B1 and liver cancer (CAST, 1989). The levels of aflatoxin consumed by humans in these studies are in the milligram quantities per kilogram of body weight. For example, in Kenya the daily dietary aflatoxin intake was 3 to 15 mg/kg of body weight. Since a kg is approximately 2 pounds, a 140 pound man would have consumed 70(kg) times the 3 to 15 mg/kg aflatoxin B1 daily or 210 to 1050 mg (210,000,000 to 1,050, 000,000 ng) aflatoxin B1 daily. These levels would have resulted in a liver cancer incidence of 1 to 16 per 100,000 population, respectively. In Swaziland, the highest consumption of aflatoxin B1 in food was 43 to 53 mg/kg daily which would translate to 3,010 to 3,910 mg (3,010,000,000 to 3,910,000,000 ng) aflatoxin B1 daily for a 140 pound man. At this level of consumption, the cancer incidence increased to 35 liver cancers per 100,000 population. (CAST, 1989). If we look at the epidemiological studies of various populations in Africa which show an increased level of liver cancer (not respiratory), the main source of aflatoxin B1 was cassava and peanut butter which had 465.5ppb (100% of samples were positive) and 143.6 ppb (99% of samples were positive), respectively (Peers and Linsell, 1973; Linsell and Peers, 1977; Appleton, 1985; Doll, 1990).

Other epidemiological studies have repeatedly shown that humans are susceptible to liver carcinoma from consumption of high levels of aflatoxin B1 contaminated food products from Africa and Asia (Campbell et al., 1970; Akintonwa, 1982). Thai and Indian children became ill after eating 2 to 6 mg (2,000,000 to 6,000,000 ng) of aflatoxin daily in their corn over a period of a month. They developed a toxic hepatitis. There was no respiratory or oral cancer reported in this study. In Mozambique and Tanzania, there is a direct correlation between the ingestion of aflatoxin B1 in the diet and liver cancer. There have been no epidemiological associations reported in the 35 years of study of aflatoxins between aflatoxin B1 and M1 and laryngeal cancer. The target organ for these toxins has repeatedly been reported to be the liver and bile duct.

Adamson et al (1973), fed a newborn rhesus monkey with 0.05 mg/day (50,000 ng/day) three times a week for 5 months; at 5 months the amount was increased to 0.2 mg/kg (200,000 ng/daily) every other week, at 44 months of age the dose was increased again to 0.8 mg/kg three times weekly every other week. A total of 840 mg (840,-000,000 ng) of aflatoxin B1 was given to the monkey by the time it was 74 months old. The major site of activity of the aflatoxin was on the liver and bile ducts. No respiratory or oral cancer was observed. It should be noted that "mg" are 1,000,000 times more concentrated than the "ng" which we generally measure in milk.

Reddy et al. (1976) produced liver tumors in 50% of 18 Tree Shrews, a small (95 to 140 g) nonhuman primate, by feeding 2 ppm. Aflatoxin B1 in the diet for 74 weeks or more (estimated intake was 24 to 66 mg (24,000,000 to 66,000,000 ng)). No respiratory cancer or tracheal cancer was seen in this study and all cancers observed in the study were hepatocellular (liver) carcinoma. The target organ was the liver and bile ducts. Primates tend to be in the middle range of susceptibility to hepatocarcinogenicity of aflatoxin B1 with trout being one of the most sensitive animals and sheep being one of the most resistant mammals (CAST, 1989).

*Id.* at 13–15.

Plaintiff recognizes that aflatoxin B–1 has been found to cause liver cancer in humans. Dr. Draughon, *see supra*, notes that, "Although a positive correlation has been seen between aflatoxin B–1 exposure and liver cancer in African and Asian populations, there is no evidence that aflatoxins contribute similarly to liver cancer incidence in the United States." And she notes that in various parts of Africa and Asia there are very high levels of exposure to aflatoxin B–1. So do these same Asian and African populations have a higher incidence of laryngeal cancer?

Dr. Draughon answers: "There have been no epidemiological associations reported in the 35 years of study of aflatoxins between aflatoxin B–1 and M–1 and laryngeal cancer. The target organ for these toxins has repeatedly been reported to be the liver and bile duct." To the Court, the absence of studies showing a correlation between even dramatically high exposures to aflatoxin B–1 and laryngeal cancer in the very populations which do show a high correlation between such exposure and liver cancer, is of some significance. Of course, many of the studies dealt with dietary intake of aflatoxins rather than exposure via inhalation. But the handling of agricultural products which are sources of aflatoxin B–1 in these African and Asian areas would seemingly subject such populations to significant exposure to aflatoxins in the dust.[6] Regardless, for whatever reason or reasons, we do not have epidemiological support for the proposition that those exposed to aflatoxin B–1 in their diet or by inhalation have a higher incidence of laryngeal cancer than those who are not so exposed.

After dealing with AFB, Dr. Draughon turns her attention to a study of the scientific evidence relating to the carcinogenicity and mutagenicity of AFM with which we are dealing in this case and which has not been studied nearly as thoroughly as aflatoxin B–1. Nevertheless, many studies have been made and she reviews them in her report as follows:

> Only a few studies are available on the carcinogenicity of aflatoxin M1 in animals and these will be reviewed. The first study is by Grice et al. (1973). Aflatoxin B1 was fed to lactating or pregnant rats in a toxic meal containing 10 ppm (10,000 ppb) aflatoxin B1. The diet was so toxic that animals died so the researchers diluted the toxic meal with wholesome meal by 50% and 25% so that animals would not die before the study was completed. At this level, there were still abortions and deaths in the animals. Researchers were able to show liver toxicity and liver cancer devel-

oped in the adults and in some of the progeny. The referenced study used a toxic meal containing 10 ppm (10,000 ppb aflatoxin B1). (The action level for milk is 0.5 ppb aflatoxin M1). Therefore, extremely high levels of aflatoxin B1 had to be fed the Rat Dams to bring about liver damage in offspring. It is notable in this study that even with the extremely high levels of aflatoxin B1 being fed to rats and the high levels of M1 which progeny received in the milk of the dams (approximately 100 ppb aflatoxin M1) that liver/bile duct toxicity and liver cancer were the findings. Three of the animals had cancer which had spread from the liver to other body organs (metastasis) due to the high levels of toxin being fed.

One study actually looked at the feeding of aflatoxin M1 to rats at levels of 0.5, 5.0 and 50 ppb aflatoxin M1 and 50 ppb aflatoxin B1 (Hsieh et al., 1984). No tumors were produced at 0.5 or 5.0 ppb aflatoxin M1 in the diet of the animals which fed for 21 months. No tumors were produced in the 50 ppb aflatoxin M1 treatment group until after the 19 months of treatment. In the 50 ppb aflatoxin M1 treated rats, two animals out of 18 animals developed tumors which were confirmed as hepatocellular carcinomas. Four animals receiving 50 ppb aflatoxin M1 were found to have neoplastic nodules. In the aflatoxin B1 treated animals, 19 of 20 animals had liver tumors. Control animals receiving no aflatoxin had one liver tumor.

The authors (Hsieh et al., 1984) concluded that aflatoxin M1 is about 2 to 10% as hepatocarcinogenic as aflatoxin B1. A follow-up to this study by the same researchers (Cullen et al., 1987) reported that four animals had pulmonary adenomas. Two lung adenomas occurred in the control group (no aflatoxin) and two in the the aflatoxin treated group. Numerous testicular neoplasms were found in controls (no aflatoxin) and other treatments. The authors reported that Male Fisher strain 344

---

6. Early on in the case the plaintiff principally relied on the theory that the eating of aflatoxin contaminated cheese caused his laryngeal cancer. However, ingested foods rarely come in contact with the larynx. *See* Dr. Teitelbaum's testimony. In any event, plaintiff now relies upon exposure through the inhalation of aerosolized milk particles.

rats have been reported to develop these neoplasms spontaneously and frequently. There were no tracheal or respiratory cancers reported when animals were exposed to 50 ppb aflatoxin M1.

One interesting finding was that three intestinal neoplasms were found in the aflatoxin treated animals. As mentioned previously, this is probably due to the fact that aflatoxin is excreted in large amounts in the urine and feces of animals (Applebaum et al., 1982). In fact, aflatoxin M1 has been shown to be toxic to the kidney of animals because of this route of excretion. To quote the authors of this study (Cullen et al., 1987) "In the United States, human exposure to aflatoxin M1 occurs by ingestion of milk and other dairy products. The average human ingestion of aflatoxin M1 based on contamination levels of milk has been estimated to be 0.11 ppb. This is below the levels which were carcinogenic in Male Fisher Rats in this study. Human susceptibility to aflatoxin B1 hepatocarcinogenesis is believed to be lower than that of Fisher rats. This is based on the low susceptibility of primates to aflatoxin-induced carcinogenesis and the similarity of aflatoxin B metabolism by postmitochondrial fractions of human and monkey liver compared to the Fisher rat. Since aflatoxin M is considerably less potent than aflatoxin B, the risk of hepatocellular carcinoma induced by aflatoxin M appears to be low."

It is very important not to confuse aflatoxin M1 with aflatoxin B1 because of differences in their mutagenicity and carcinogenicity. While the mechanism of action of these toxins may be the same, their mutagenicity and carcinogenicity are quite different as shown above.

In a few animal studies done with aflatoxin M1 in rats, the target organ has been shown to be the liver with occasional kidney toxicity. There have been no studies on aflatoxin M1 with primates of any type but we would expect primates to be more resistant than rats to aflatoxin M1 as they are to aflatoxin B1 for reasons discussed above by Cullen et al. (1987). There have been no studies showing any association between aflatoxin M1 and pulmonary diseases or respiratory cancer.

There have been no studies either epidemiological or otherwise showing carcinogenicity in humans consuming aflatoxin M1. This is due to the fact that levels of aflatoxin M1 are much lower than aflatoxin B1 in the food supply and aflatoxin M1 is much less carcinogenic than aflatoxin B1 (Cullen et al., 1987; CAST, 1989).

*Id.* At 15–17.

The plaintiff does not agree with Dr. Draughon's analysis of some of the studies, see *infra*, but the Court concludes after reviewing those studies that her analysis is correct.

### E. The No–Threshold Theory

Citing the *Reference Manual on Scientific Evidence,* Federal Judicial Center (1994), plaintiff contends there is no threshold for genotoxins, in that any one molecule of such a carcinogenic mutational agent can produce alterations in genetic material leading to cancer. Plaintiff argues that everyone agrees Mr. McDougal was exposed to some aflatoxin, and, thus, he contends it is not necessary to calculate the level of his exposure. The Court has reviewed the *Reference Manual on Scientific Evidence* and notes the section upon which plaintiff relies is entitled *Reference Guide on Toxicology.*[7] That section begins by noting that toxicology "classically is known as the science of poisons." *Id.* at 185. A more modern definition includes "the study of the adverse effects of chemical agents on biological systems." *Id.* (quoting Louis J. Casarett, John Doull, *Casarett and Doull's Toxicology: The Basic Science of Poisons,* 3 (4th ed.1991)).

The Reference Manual notes that there are "three central tenets of toxicology: First, 'the dose makes the poison'; this implies that all chemical agents are harmful—it is only a question of dose.... Second, many chemical agents produce a specific pattern of toxic effects that are used to establish disease causation. Third, the responses of laboratory animals are useful predictors of toxic responses in humans." *Id.* (footnotes omitted).

7. P. 181, authored by Bernard D. Goldstein and Mary Sue Henifin.

Specifically, this section addresses the no-threshold model and determination of cancer risk at page 189:

> Certain mutational events, such as those leading to cancer and some inherited disorders, are believed to occur without any threshold. In theory, the cancer-specific alteration in the genetic material of the cell can be produced by any one molecule of the mutational agent. The no threshold model led to the development of the one hit theory of cancer risk, in which each molecule of a chemical has some finite possibility of producing the mutation that leads to cancer. This risk is very small, since it is unlikely that any one molecule of a potentially cancer-causing agent will reach that one particular spot in a specific cell and result in the change that then eludes the body's defenses and leads to a clinical case of cancer. However, the risk is not zero. The same model also can be used to predict the risk of inheritable mutational events. [Footnote 18 in original] [8]

The plaintiff also brings our attention to the Appleton article.[9] The "no threshold" views expressed therein deal with the Hepatic Macromolecular Binding of AFB in rats showing a linear dose-response curve even at very low exposures. The significance of this seems to be: liver cancer can be induced with low level exposure to AFB.

8. The footnote to this quoted section [Footnote 18 in original] states:

> For further discussion of the no threshold model of carcinogenesis, see Office of Technology Assessment, U.S. Congress, Assessment of Technologies for Determining the Cancer Risks from the Environment (1981); Gary M. Williams & John H. Weisburger, *Chemical Carcinogenesis*, in Casarett and Doull's Toxicology: The Basic Science of Poisons, *supra* note 1, at 127.
>
> The no threshold model, as adopted by the Occupational Safety and Health Administration (OSHA) in its regulation of workplace carcinogens, has been upheld. Public Citizen Health Research Group v. Tyson, 796 F.2d 1479, 1498 (D.C.Cir.1986) (as set forth in 29 C.F.R. § 1990.143(h) (1985), "no determination will be made that a 'threshold' or 'no effect' level of exposure can be established for a human population exposed to carcinogens in general, or to any specific substance"), *clarified sub nom.* Public Citizen Health Research Group v. Brock, 823 F.2d 626 (D.C.Cir.1987).

This study was designed to investigate whether a low dose threshold could be observed for the covalent binding of aflatoxin to liver macromolecules at very low AFB exposures. A secondary objective was to examine the effect of hepatic GSH depletion caused by DEM pretreatment on the dose response curve for aflatoxin macromolecular binding.

Within the dose levels of AFB used, the authors could find no evidence for a threshold for such covalent binding to macromolecules. But they caution: although covalent binding of aflatoxin to macromolecules is thought to be the first step in the pathogenesis of liver cell cancer, the events that subsequently occur during the promotional phase may be even more important. "Thus a straightforward quantitative relationship between macromolecular binding and liver cell cancer cannot always be assumed." The parties have made the Court aware of the various stages leading up to the clinical diagnosis of certain cancers, such as liver cell cancer. Plaintiff's Exhibit NN shows a schematic presentation from "exposure" on day 1 through "initiation," "promotion," "conversion," to "progression" over a latency period of 12,775 days. Of course, the body's defenses, such as its immune system, fight back at every stage, often thereby successfully preventing the development of a malignancy.

> While the one hit model explains the response to most carcinogens, there is accumulating evidence that for certain cancers there is in fact a multistage process, and that some cancer-causing agents act through nonmutational processes, so-called *epigenetic* or nongenotoxic agents. Committee on Risk Assessment Methodology, National Research Council, Issues in Risk Assessment 34–35, 187, 198–201 (1993). For example, the multistage cancer process may explain the carcinogenicity of benzo(a)pyrene (produced by the combustion of hydrocarbons such as oil) and chlordane (a termite pesticide). On the other hand, nonmutational responses to asbestos cause its carcinogenic effect. What the appropriate mathematical model is to depict the dose-response relationship for such an agent is still a matter of debate. *Id.* at 197–201.

9. B. Scott Appleton, M.P. Goetchius, & T.C. Campbell, *Linear Dose–Response Curve for the Hepatic Macromolecular Binding of Aflatoxin B, in Rats at Very Low Exposures*, 42 Cancer Research 3659–62 (1982).

Finally, the last paragraph of the article states: "Although a dose threshold for adduct formation may exist at still lower doses, 10 ng/kg is within the human exposure range. Thus, it may be reasonable to assume that, for low-level AFB[ ] exposure, macromolecular adduct formation is a linear function and that hepatic GSH offers little protection against such binding." So, even here, the authors acknowledge that there may exist a dose threshold for adduct formation as a result of AFB exposure at levels below those studied.

■ Recently, Judge Saris, of the United States District Court of Massachusetts, rejected the no-threshold model with regard to the chemical benzene. *Sutera v. The Perrier Group of America*, 986 F.Supp. 655 (D.Mass. 1997). That case involved the question whether the plaintiff's exposure to benzene in Perrier drinking water caused him to contract acute promyelocytic leukemia ("APL"). In that case, the Court noted that benzene was a known carcinogen and cause of acute myeloid leukemia, ("AML") of which APL was a subgroup. *Id.* at 659. The Court observed that a "no safe level," "no-threshold" or "linear model" approach states that any level of exposure to a toxic agent is sufficient to have caused plaintiff's leukemia. *Id.* at 660. The Court noted its responsibility to assure that scientific opinions are properly grounded in fact. *Id.* at 661. Furthermore, a causation expert must provide more than unsubstantiated conclusions. *Id.*

■ Judge Saris emphasized the importance of the gate keeping role in toxic court cases "where the plaintiff claims that exposure to a toxic substance caused his injury, [because a] jury might blindly accept an expert's opinion that conforms with their underlying fears of toxic substances without carefully understanding or examining the basis for that opinion." *Id.* at 660 (alteration in original and citations omitted). In rejecting the no-threshold model, the Court highlighted the difference in the proof required in situations where regulatory agencies set action levels as opposed to the proof required in tort law. *Id.* at 664. Regulatory agencies' threshold of proof is reasonably different and lower than that in tort law, the Court stated.

Tort law requires proof that it is more likely than not that another party has caused a particular harm. *Id.* (citing *Wright v. Willamette Indus.*, 91 F.3d 1105, 1107 (8th Cir .1996)).

In *Sutera*, the Court noted that whether inhaled or ingested, benzene is a known carcinogen and an established cause of AML, the subtype of leukemia at issue in the case. *Id.* at 659. Applying the no-threshold model of causation to benzene "leads to the conclusion that virtually any exposure to benzene could cause chromosomal damage and increase the chance of cancer." *Id.* at 660. The Court analyzed the proffered opinions and their underlying scientific bases and still concluded the plaintiff had failed to produce reliable scientific evidence that his leukemia was "more likely than not caused by his drinking Perrier." *Id.* at 662–67. In sum the Court concluded that the linear no-threshold model of causation is merely an hypothesis with "no known or potential rate of error." *Id.* at 667 (citing *Whiting v. Boston Edison Co.*, 891 F.Supp. 12, 25 (D.Mass. 1995)).

It appears that the plaintiff's causation evidence in *Sutera* was much stronger than Mr. McDougal's causation evidence here. In *Sutera*, it was acknowledged that the suspect carcinogen, benzene, causes AML, of which APL is a subgroup. And the exposure evidence was also much stronger and more definite there. Nevertheless, the Court concluded the plaintiff's evidence would not permit a jury to find that it was more likely true than not true that his leukemia was caused by his exposure to benzene in the Perrier water he drank. The Court views the *Sutera* decision as doubtful or, at least, as raising a very close question as to the admissibility of some of the plaintiff's causation evidence. Nevertheless, it agrees with the *Sutera* Court's handling of the one-shot, no threshold arguments.

*Allen v. Pennsylvania Engineering Corp.*, 102 F.3d 194 (5th Cir.1996) is also a toxic tort case involving a genotoxin. Plaintiff has argued that aflatoxin is a genotoxin not subject to the same rules that apply to other chemical agents. He argues that one molecule of aflatoxin can cause cancer and that he, there-

fore, need not prove the level of exposure required to cause laryngeal cancer. But *Allen* states, "Scientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiff's burden of proof in a toxic tort case." *Id.* at 198. In *Allen* the plaintiff's expert opined that ethylene oxide reaches brain tissue, alkaylates DNA and "clearly causes animal brain tumors." But the *Allen* court states:

> Third, the cell biology data show only that ETO (ethylene oxide) has mutagenic and genotoxic capabilities in living organisms, not that it necessarily causes brain cancer in humans or in Allen's particular case. That ETO may have these affects on living cells or genes is the beginning, not the end of the scientific inquiry and proves nothing about causation without other scientific evidence.

*Id.* at 198.

The *Allen* court also stated that:

> Scientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiff's burden in a toxic tort case.

*Id.* at 199.

Under the no-threshold theory, it is accepted that one hit from a carcinogenic molecule could cause cancer. However, as noted by the Reference Manual on Scientific Evidence, "[t]his risk is very small, since it is unlikely that any one molecule of a potentially cancer-causing agent will reach that one particular spot in a specific cell and result in the change that then eludes the body's defenses and leads to a clinical case of cancer. However, the risk is not zero." As developed during the testimony, and explored in the *Sutera* case, regulatory agencies employ a different perspective in setting "action levels" than do the courts in imposing tort liability. Establishing that the risk of causation "is not zero" falls woefully short of the degree of proof required by *Daubert* and its progeny.

In a February 4, 1998 letter to the Court, Plaintiff cited two cases that he discovered after the post hearing argument, one being the case of *Wilson v. Petroleum Wholesale, Inc.,* 904 F.Supp. 1188 (D.Colo.1995). In *Wilson,* the Court found that the defendants' objections to the plaintiff's proffered scientific testimony were "properly suited for the province of cross-examination." Moreover, the Court noted that some of the defendants' objections focused on the expert's ultimate conclusion rather than the underlying methodology employed. Mr. McDougal urged the Court that cross-examination and the Court's ability to direct a verdict or grant a judgment notwithstanding the verdict provided ample protection against an improper jury verdict. The Court respectfully disagrees. The Court has an obligation under *Daubert* to determine the admissibility of scientific evidence when that evidence is challenged. Only if the Court were truly a "hung jury" on the *Daubert* issue would it be appropriate to follow plaintiff's suggestion. Here, we have no reason or excuse to temporize.

■ The parties have had the opportunity to fully explore and develop the factual and underlying scientific bases for plaintiff's scientific causation testimony. Defendant has cross-examined plaintiff's experts and has challenged specifically the underlying scientific bases for their opinions. This proceeding does not involve an assault upon the conclusions reached by the experts. It involves the science underlying those conclusions. As such, the Court has a duty to determine whether plaintiff's expert causation evidence has sufficient scientific reliability to allow plaintiff to place that evidence before the jury in the first place. The Court is of the opinion that the "no-threshold" or "one-shot" theory has respectable scientific support as a matter of scientific theory. But, it does not provide a scientific basis for a jury to find that it was more likely than not that John McDougal's cancer was caused by AMPI's exposing him to milk contaminated with aflatoxin M-1. We learn from *Wright,* that it is not enough to show that a chemical agent "sometimes causes the kind of harm complained of," and here we know, that plaintiff has not even shown that AFM "sometimes causes" laryngeal cancer. But *Wright* goes

farther: "At a minimum, we think that there must be evidence from which the factfinder can conclude that the plaintiff was exposed to levels of that agent that *are known to cause the kind of harm that the plaintiff claims to have suffered.*" *Wright*, 91 F.3d at 1107. (Emphasis supplied.) Again, *Wright* does not say that plaintiff need merely show that he was exposed to a chemical that possibly could, under accepted scientific theory, cause such harm. Therefore, the Court concludes that *Wilson* does not support the Court's ruling in plaintiff's favor.

Another case cited in plaintiff's February 4, 1998 letter is the Sixth Circuit case *Cantrell v. GAF Corp.*, 999 F.2d 1007 (6th Cir.1993). The Court has reviewed that case and concludes that it presents a situation which is not analogous to Mr. McDougal's case. *Cantrell* involved claims that asbestos exposure had caused laryngeal cancer. *Id.* at 1010. A doctor testified that he had diagnosed three of the 150 workers he personally examined from a particular facility as having laryngeal cancer. *Id.* at 1013. The Court observed that this fact alone did not prove that something in the facility was causing cancer. However, the trial court noted that this rate of occurrence was "hundreds of times" in excess of the expected occurrence of laryngeal cancer in the general population—about four per 100,000 individuals. *Id.* The Court noted the "stark, striking contradictions" between the expected and actual number of laryngeal cancers.

Although the Court is of the opinion that this case is distinguishable on other grounds, these facts alone minimize its persuasive value. Apparently, Mr. McDougal was the only employee who worked at the HVF during the relevant time period who was diagnosed as having laryngeal cancer. Plaintiff contends in his letter that laryngeal cancer in 21 year old, non-smoker, non-drinkers is "almost unheard of . . ., being virtually one in a million." Feb. 4 letter at 6. However accepting plaintiff's assertion as true, one case occurring in the workforce, as here, does not present the "stark, striking contradiction" which the *Cantrell* court found. Even though this Court might not agree with the power of the association identified in *Cantrell,* the large number

of three cases of laryngeal cancer in a workforce of 150 is equivalent to an epidemiological study. This Court recognized such as a legitimate alternative method to establish scientific reliability. *See National Bank of Commerce v. Dow, supra,* where we observed:

Furthermore, as pointed out by Judge Kozinski in *Daubert II* and Judge Ellis in *Cavallo,* causation can sometimes be proved without the benefit of any such studies. This court suggested a hypothetical situation which could accomplish this in its "Notes and comments," Appendix F, p. 2.

Assume further that 25 of the women met daily thereafter in a room that had on the previous day been treated with organophosphate insecticide "X" and that these women stayed in that room for three hours each morning for the next six week period. Assume the other 25 women met in another room which had not been treated by this insecticide but that otherwise the two rooms were identical. If all 25 of the women exposed to the insecticide (manifested by low blood cholinesterase levels) had children born with the same birth defects and if none of the other 25 women (whose blood cholinesterase levels remained unchanged) had a child born with a birth defect, no one would contend that the circumstance that insecticide "X" had not previously been established as a human teratogen by using the accepted protocol would, or should, prevent the case from going to the jury upon such an evidentiary showing. Of course defendants would probably agree, pointing out that the phenomenon itself, as stated in the hypothetical, would, in effect, be the equivalent of a scientifically valid epidemiological study on human "subjects" which would obviate the need for animal studies, etc. And it is obvious that the trial of the case would not have to await "falsifiability" tests, publication and peer review, or the establishment of error rates. And even if this theory of causation had not received prior "general acceptance" within the pertinent scientific community, the "phe-

nomenal" evidence hypothesized would surely suffice. This is because that evidence satisfies the *Daubert* admissibility standards of scientific validity and, thus, evidentiary relevance and reliability.

Additionally, the Court need not address the *Cantrell* court's discussion of fear of future consequences. This Court has held that fear of future consequences is an element of damages at best, and is not an independent basis for recovery. In light of the Court's ruling on plaintiff's causation experts, issues of damages need not be addressed. Furthermore, the same *Daubert* analysis found herein would apply to any attempt to recover based upon the theory of fear of future consequences, with the Court obviously arriving at the same conclusions. In sum, neither of the cases submitted in plaintiff's February 4, 1998 letter alter the conclusions of the Court on the *Daubert* issues.

### F. Differential Diagnosis

█ The Court also is of the opinion that the differential diagnosis approach does not significantly buttress plaintiff's causation analysis under the facts and circumstances of this case. First, the Court is convinced that plaintiff has not successfully ruled out other possible alternative causes. Second, even where other alternative causes are more rigorously ruled out, that does not relieve plaintiff of his obligation to "rule in" AFM (to which he was exposed) as a contributing cause of his laryngeal cancer. Judge Ellis, in the case of *Cavallo v. Star Enterprise*, 892 F.Supp. 756 (E.D.Va.1995), discusses the role of differential diagnosis when used as a basis for an expert's causation opinion in a toxic tort case:

> The process of differential diagnosis is undoubtedly important to the question of 'specific causation.' If other possible causes of an injury cannot be ruled out, or at least the probability of their contribution to causation minimized, then the 'more likely than not' threshold for proving causation may not be met. But, it is also more important to recognize that a fundamental assumption underlying this method is that the final, suspected 'cause' remaining after this process of elimination must

actually be capable of causing the injury. That is, the expert must 'rule in' the suspected cause as well as "rule out" other possible causes. And, of course, expert opinion on the issue of "general causation" must be derived from a scientifically valid methodology.' "

*Cavallo,* 892 F.Supp. at 770–71.

Plaintiff points out that it is extremely rare for a person as young as Mr. McDougal to get laryngeal cancer. He was 26 years of age in February, 1995, when he was diagnosed as suffering from this malignancy. And it is also generally accepted that 75 to 90 percent of all such cancers are caused by smoking tobacco or consuming alcohol. Plaintiff maintains, and the Court accepts for the purposes of the pending motions, that Mr. McDougal neither smoked nor drank.

Dr. Teitelbaum discussed this issue in a colloquy with the Court:

> THE COURT: And can you state that cancer of the larynx will not occur absent some outside influence; in other words, cannot be purely genetic?
>
> A. It certainly is not observed as a cancer that occurs in the absence of environmental influences. It is one of those cancers which is most strongly associated with environmental exposure.
>
> THE COURT: So probably are there studies out there in the medical world which talk about this type of cancer, laryngeal cancer, which says we know it is caused by smoking, we know it is caused by alcohol, we know it is caused by radon, we know it is caused by asbestos, we know it is caused by cutting fluids, rubber, that accounts for 80 percent of the cancers?
>
> A. Much more than 80 percent.
>
> THE COURT: In other words, what's the percentage of laryngeal cancers, the causes of which have not been identified or people just say we don't know?
>
> A. I would say it is a very small amount. The attributable risk percentage that's been calculated for smoking is somewhere between 75 and 90 percent of the cases.
>
> THE COURT: 75 and 90 percent of all laryngeal—

A. Of All laryngeal cancers are caused by smoking.

THE COURT: Are caused by smoking. So we are dealing with this maybe 20 percent or less?

A. That's correct.

THE COURT: Of the rest of them that are caused by all these other things?

A. All the other known environmental influences. And they are unknown cancers in people who do not have that kind of environmental exposure. Now, think about the fact that there is, if you go into a rural area where people are charcoal broiling their meat all the time and living in smoky environments, you are going to see laryngeal cancer. But it would have to be a pristine environment in which there were no smoke, in order for the disease to be prevented entirely. The whole purpose of the studies that have been done on cigarette smoking and on other causes of laryngeal cancer is to eliminate those causes, because this is virtually totally preventable.

THE COURT: You've been over it, if you want to add any more about the dosage issue. You also accepted a medical history, I gather?

A. Yes sir.

THE COURT: That medical history that you've accepted is—what are the elements of it that are important to you?

A. Well, I have in my deposition file a summary of all of the medical history that we obtained. We have no childhood medical records. But all of his other medical records exclude any other known cause. There is the issue of side stream cigarette smoke which has been raised and which I have certainly looked through the literature repeatedly for. There is no study, none, which associates side stream cigarette smoke and laryngeal cancer.

THE COURT: Just ambient smoke, if you're in the presence of smokers, there's been no indication—

A. There is no such study. There's nothing. I assure you that with the focus that has been on tobacco smoking and so on, if there were, it would have been published.

The *Journal* would love to publish this study.

THE COURT: Why did they pay all those stewardesses all that money who don't smoke but are in the cabin—

A. Not for laryngeal cancer, but for heart disease and other lung problems.

THE COURT: So it didn't—

A. If you ever had the misfortune to sit in the smoking section in the back of a 727, as a passenger you were entitled to compensation.

THE COURT: None of those people had cancer as a consequence?

A. No. They were not cancer issues.

THE COURT: You say it excluded all other possibilities. For instance, did you go down and say, he never lived in a home where there was radon, he never lived in a situation where there was asbestos, he never dealt with the rubber industry and so forth?

A. So far as I know, all those things are excluded by my review. The only things that are not excluded and that may have been a factor are his allergies, which produce a chronic reactive disorder in the upper airways, and that can be a cocarcinogenic effect.

THE COURT: An allergic—

A. A cocarcinogenic effect.

\* \* \* \* \* \*

THE COURT: So you accept, for instance, he didn't live in a home where there was any formaldehyde from any of the carpets?

A. There's no evidence that's so. He didn't live in a mobile home. He didn't live in—we are talking about a small home that was not built with contemporary materials and particle board and so on. There's no evidence that any of those were issues.

THE COURT: What about foods? Coffee?

A. Does coffee have carcinogens in it? Probably not. The study that's been done on coffee is probably a study of cigarette smoke. There was that whole issue of whether pancreatic cancer is a result of coffee. It turns out that the pancreatic

cancer is associated with the smoking and not with the coffee.

THE COURT: So far as you know—

A. I would say there is nothing in that that would be convincing.

THE COURT: How about all the other foods that people ordinarily eat?

A. There would be carcinogens in everything that we eat. We also have anticarcinogen, and we also have intact repair mechanisms.

THE COURT: So, when you are excluding other alternatives as the possible cause of this, why are you excluding those carcinogens?

A. I'm not excluding them. I'm saying that everybody has them. But not everybody gets that kind of cancer. It is extremely unlikely. In Dr. Stern's paper on one of his papers on the laryngeal mucosa, he makes the point very early on that alcohol never gets to the larynx. Food rarely gets to it. Now, in my deposition it was some discussion about reflux and whether in reflux you get—a gastric reflux, you do get some gastric products with nitrosamines in it which reach the larynx. He has no history of that, none whatsoever.

THE COURT: When you fill up your gas tank and you are standing there over the pump and you smell that gasoline, are you inhaling a carcinogen? ·

A. You are probably inhaling ethylene, which is the light end. Ethylene is metabolized to ethylene oxide. And you may be inhaling a carcinogen. Some of the background cases of leukemia for which we have no other explanation due to that, it is an interesting question, and it has been addressed. There is a paper from Sweden by Dr. Tornfist who says that from just ambient gasoline pollution, primarily the ethylene, there are eight cases of cancer per year in Sweden. She's got it down to that. But that's so improbable, and it certainly doesn't cause laryngeal cancer.

THE COURT: I guess that's the question that we are dealing with, it's so improbable

Tr. Vol. 2 at 69–70, 72–80.

Dr. F.A. Draughon has listed numerous carcinogens in foods we eat every day. And she points out that eating peanut butter provides a much more likely human exposure to AFB than milk would for AFM. Indeed, the Human Exposure/Rodent Potency Index (the HERP Index) shows the daily human exposure. The higher the HERP value, the higher the human exposure is relative to the dose that gives tumors to rodents. Examples are as follows:

| | HERP (%) |
| --- | --- |
| Phenobarbital, sleeping pill | 14 |
| Beer (ethyl alcohol) | 2.1 |
| Mobile home air (formaldehyde) | 1.4 |
| Wine (ethyl alcohol) | 0.5 |
| Conventional home air (formaldehyde) | 0.4 |
| Coffee, (Caffeic acid) | 0.1 |
| Orange juice (di Limonene) | 0.03 |
| Apple (caffeic acid) | 0.02 |
| Aflatoxin | 0.008 |

Dr. Draughon, after accepting the calculations of plaintiff's experts on plaintiff's exposure, observed as follows:

Therefore, if we accept the calculations and studies conducted by Dr. Fowler, Dr. Mazumder and Dr. Valentine, we see that a person working at HVF would have been exposed to approximately 0.04 to 0.08 ng/week of Aflatoxin M1 aerosols generated through processing operations. Even though these values are very small, I believe them to be a high estimate since the volume of the room used for cheesemaking and air exchange was not considered in the calculations of Dr. Fowler. These calculated values for possible Aflatoxin M1 exposure through aerosols are significantly less than those for Aflatoxin B1 to which workers in feedmill or farm operations are exposed (39 to 2500 ng/week, Burg et al, 1981, Hayes et al., 1984, Olson et al., 1988). The magnitude of exposure to Aflatoxin B1 is from 100 to 10,000 times higher in the feedmill operations with aflatoxin B1 and the authors of those studies did not report an increased risk of tracheal cancer with exposure to mold dust.

During one day, if an average person or child drank a quart of milk (a liter) which had 0.5 ppb aflatoxin M1 (the legal Action Level), they would consume 0.5 (micro)g/mL or 500 ng/l or 500 ng aflatoxin M1. If they drank a quart of milk each day (4 cups), they would have been exposed to 3500 ng of aflatoxin M1 in one week.

These levels are unlikely since Aflatoxin M1 is only found sporadically in fluid milk. However, these levels are considered a negligible risk by the Food and Drug Administration since the Action Level was established at 0.5 ppb Aflatoxin M1 in milk.

If a person drank the milk from HVF over a period shown above (16 positive milk samples, over a period of 32 weeks), they would have consumed an average of 217 ng Aflatoxin M1 in a week. (310 ng * 16 occasions/160 days *7 days a week). By drinking this milk, the average person would have been exposed to approximately 500 to 1000 times the amount of Aflatoxin M1 in aerosols to which Mr. McDougal was allegedly exposed while working in the dairy plant. In one day of drinking one liter or one quart of this milk from HVF, they would have been exposed to more Aflatoxin M1 than Mr. McDougal was exposed to in the aerosols during his entire period of working at HVF. However, the 217 ng Aflatoxin M1 in this milk is well below the 3500 ng of aflatoxin M1 in one week established by the Food and Drug Administration as constituting "negligible risk" (one increased cancer per million persons.)

Eating the cheese from this milk was not hazardous since levels of Aflatoxin M1 in the milk were much lower than levels of aflatoxin MI shown to cause hepatocarcinoma in rats (50 ppb.) Or which the FDA deems a negligible risk (0.5 ppb in milk). Rats in the Cullen et al. (1987) study were exposed to approximately 1 mg of aflatoxin MI (50 ppb treatment level) to generate liver carcinoma in two animals out of 18 animals. The fact that Mr. McDougal ate cheese while working is immaterial since levels to which he was exposed in the cheese are also similar to the regular population and aflatoxin M1 has not been shown to cause any ill effects in humans at these levels. As for Mr. McDougal's dermal exposure, there has been no evidence shown that this type of exposure to M1 at such low levels would have any ill effects.

Draughon Report at 26–27.

Some further comments upon plaintiff's differential diagnosis testimony may be help-

ful. Dr. Teitelbaum testified that Mr. McDougal's allergies made him more susceptible to carcinogens. But the consequence would seem to be, for our purposes, that his allergic condition made him more likely to develop laryngeal cancer, *if he were exposed to a carcinogen that targets the larynx.* No one has advanced any scientific evidence indicating that AFM has ever caused laryngeal cancer in humans. If Mr. McDougal's allergic condition makes him more susceptible to carcinogens, then he would be more susceptible to tobacco smoke, a carcinogen that is known to cause from 75% to 90% of all laryngeal cancer.

Mr. McDougal was exposed to some ambient or "side stream" cigarette smoke. His parents were smokers and his brother was a smoker. So why would not the inhalation of that ambient tobacco smoke be suspected of causing Mr. McDougal's cancer? Dr. Teitelbaum's response: "There is no study, none, which associates side stream cigarette smoke and laryngeal cancer." The only reasonable explanation would appear to be that the dose resulting from breathing side stream tobacco smoke must not be sufficient to trigger or initiate the cancer process. But the explanation also tends to negate plaintiff's one-shot, no threshold, theory. Dr. Teitelbaum earlier stated: "Smoking is a weak carcinogen. We've already said that people who smoke heavily—and the American Cancer Society defines that as 15 cigarettes a day or greater. Only 10 to 12, maybe 15 percent of those people who have smoked for 60 years get cancer." So, once again, we see plaintiff's experts recognizing the critical role of exposure and dosage.

After discussing with the Court the many known carcinogens to which most of us are subjected either daily or from time to time, Dr. Teitelbaum stated at page 73 of his testimony:

So these have all been looked at. And all we can say is that looking at the other risks at low levels, the human larynx is a target for environmental carcinogens of a genotoxic type, which is what we are talking about here. I believe that rises to the probability, and I would not be able to say

to you that this level was too low for any individual interaction to take place. But the lower it is, the less problem it is. That's the best I can provide. I don't think this was a low exposure.

The Doctor's view on plaintiff's exposure, however, is undercut by the inadequacy of plaintiff's exposure proof. Furthermore, at no point do plaintiff's experts identify a dosage level of AFM that is known to cause laryngeal cancer in humans. So we are back to the temporal association: plaintiff was exposed to AFM and thereafter he developed laryngeal cancer. The plaintiff's experts believe that his cancer was caused by AFM and, if it was, then certainly the exposure and dose were sufficient. This flawed logic is no substitute for reliable scientific proof of causation.

This Court in the case of *National Bank of Commerce v. Dow Chemical, see supra,* quoted from an article by Dr. David Levy entitled "Scientific Evidence After *Daubert*" as follows:

How much certainty in ruling out potential confounding factors is enough? The answer should depend on their plausibility, Mesothelioma, a cancer of the chest lining surrounding the lungs, is usually caused by exposure to asbestos fibers. Mesothelioma is a "signature" disease: The injury points directly to the substance that cause it. *See The Columbia University College of Physicians and Surgeons Complete Home Medical Guide* 471 (1985). Colon cancer, however, has many risk factors: Diet, obesity, exposure to environmental hazards, and genetics. An expert witness who claims that a plaintiff's colon cancer was caused by asbestos exposure must undertake a thorough "differential diagnosis," performed by a qualified expert, to rule out other potential causes. In *Eastern & Southern District Asbestos Litigation, supra* 827 F.Supp. at 1048–49, the court dismissed a claim for colon cancer for failure to perform an adequate differential diagnosis even though the plaintiff was only 40 at his death, had no family history of cancer, suffered from no special disease or syndrome, and did not face an abnormal risk from his diet.

*National Bank of Commerce v. Dow,* 965 F.Supp. at 1513–14.

Suffice it to say that plaintiff's differential diagnosis evidence, even when coupled with his "one-shot, no threshold" theory can not obviate the need for some scientific proof that at some level of exposure aflatoxin M–1 can and does cause laryngeal cancer and that he was exposed to at at least that level.

### G. Dr. Bradley Pollock's Causation Opinion

■ Dr. Pollock's most important contribution to plaintiff's causation theory is found in his analysis of *Hayes* study on the basis of his experience as an epidemiologist and statistician. But before dealing with that analysis it is important to give an over-all view of his testimony.

First, what is his opinion as to the cause of Mr. McDougal's laryngeal cancer? At the *Daubert* hearing he testified as follows:

Q. Tell me what your opinions are in relation to Mr. McDougal's cancer being caused by aflatoxin, if you have opinions.

A. Yes. I stated these two items on the last to second page of the affidavit here. Should I read them verbatim?

Q. Sure.

THE COURT: Go ahead.

A. "Based on this assumption, it is my opinion to a reasonable scientific probability that: Number one, the exposure to aflatoxin described in Dr. Valentine's affidavit was either the outright cause, or substantially contributory to the cause, of John McDougal's laryngeal cancer. Number two, I also agree that independent of, and in addition to, the laryngeal cancer, that John McDougal has extremely substantial reasons to be concerned that more likely than not, that in the future he is apt to suffer additional cancer both in the region of his throat as well as any other area of his body, all as a result of his exposure to aflatoxin as set out in Dr. Valentine's affidavit."

BY MR. DAVIDSON:

Q. Would that exposure of future cancers be from both aerosol and eating the cheese, or do you have an opinion on that?

A. Certainly from both potential sources.

MR. DAVIDSON: Your Honor, we have those documents that you requested earlier about the incidence of cancer in young people later on in life. Dr. Pappas can submit those. We can put those in through him if you want to wait so we don't have to get into it with Dr. Pollock.

THE COURT: That's fine.

BY MR. DAVIDSON:

Q. Dr. Pollock, what have you seen in the way of epidemiology studies that would support your opinion that aflatoxin was a cause or the contributing cause of Mr. McDougal's laryngeal cancer?

A. Well, very specifically, there are two studies that were done, one by Olsen, the other one by Hayes. The Hayes study provides me with sort of the strongest weight of evidence in terms of the exposure to aflatoxin and the risk of his cancer.

Tr. Vol. 3, at 51–52.

Later in his testimony when he actually takes up the *Olsen* study, he describes it as an "hypothesis-generating study or fishing expedition." The following observation is important:

If you look at the respiratory system data in Table 2, you will see as an example under respiratory system there's observed and expected values given with an SPIR estimate. Then right underneath it you have nasal, larynx, lung and so on. And what you find here are sort of inconsistencies, that these estimates are kind of going in directions that don't make any sense. For example, they claim there's an increased risk of 33 percent; in other words, an SPIR of 133 for cancer of the larynx. And you drop down to the next line, where there's cancer of the lung, and now the estimate goes down to 74. That would be a statistically-significant estimate for lung, going in the opposite direction, showing that this exposure was protective. That's not consistent internally. And why is that? I don't think they made up data. It is probably based on some other problems or flaws in the methodology they used to identify these people. So when I see something like that, where it is not consistent, it makes me concerned. So, in fact,

the weight that I attribute to this article is very, very low. It really doesn't contribute to my forming my opinions at all.

Tr. Vol. 3, at 78–79.

Basically, it is his opinion that the *Olsen* study does not contribute anything of significance to his opinion.

So that brings us back to the *Hayes* article. Later in his testimony Dr. Pollock was asked to again summarize his opinions. His response was:

Q. Which are—what are your opinions in this case? Just briefly summarize them for me, please.

A. That aflatoxin ingestion is related to the risk of developing cancer in general, *laryngeal cancer as a possibility*, as a respiratory cancer specifically. The Hayes study clearly support that squamous cell carcinoma type tumors that occur in the upper airway are ones that are associated with at least an occupational exposure to aflatoxin.

Q. Now, you said aflatoxin ingestion. Are you talking about aerosol intake?

A. I'm talking about ingestion. I would include both aerosol intake as well as GI intake, oral route intake. There are certainly documents, referenced articles I've come across that show a systemic effect from being exposed to aflatoxins in general, so the answer is, yes, they are associated with it. And to try and compartmentalize which portion is due to oral route versus aerosol route, I don't have the facility to do that. But clearly there's evidence that aflatoxin exposure is associated with cancers all over the body.

THE COURT: And do you make any distinction between B1 and M1?

A. I don't make the distinction. I think this came up in my deposition. There is a distinction in terms of the rat potency. And I've come across the articles that sort of equate the potency in a given dose level on an animal model. But, with respect to the human effect, I can't state that. I mean, I think humans are again, we have a lot more target genes that are involved, so

we tend to be more sensitive to some of these exposures than animals are.

THE COURT: These studies were based upon exposures to B1.

A. Okay. To B1. These were. I'm sorry. Right, yes, these were.

THE COURT: You don't get M1 until the body metabolizes B1. Then you get a much, as I understand it, less potent carcinogen?

A. What I came across was a 10—a 3 to 10 percent potency rate evaluated in animal models. So that's right. But I'm sorry. Could you repeat your question to me?

THE COURT: You answered it.

Tr. Vol. 3, at 82–84.

* * * * * *

Q. Getting back to Mr. McDougal specifically, tell me what your opinions are as to whether or not aflatoxin cause this cancer to the larynx.

A. Well, in the absence of other risk factors, and with his exposure to aflatoxin, I think it was definitely contributory to him developing laryngeal cancer.

THE COURT: Does it make any difference what the dosage is? Do you have to know what the dosage is or just know he was exposed to, you know, take one breath of aflatoxin?

A. My understanding—well, my understanding is that the potential existed with one breath of aflatoxin exposure.

THE COURT: Would your opinion be the same if you had no other explanation of his cancer, you knew he inhaled one breath of aflatoxin M1?

A. I think it would be less—

THE COURT: Would you be of the opinion the cancer was caused by this?

A. I would say in that case that his cancer could have been caused by it and is less likely to be caused by it because of his more limited exposure.

THE COURT: At what point in terms of dosage do you say it is more likely than not that the inhalation or ingestion caused this cancer?

A. I can't say—dosage or dose schedule, dose intensity, these are all terms that kind of relate to the same thing. He was exposed potentially to aflatoxins, not one breath, but over a course of a year and a half or so. And I think part of the answer to your question is, well, how often was he exposed and on what area under the curve of exposure did he have.

THE COURT: What are you assuming? You are telling the Court in your opinion it was caused by it. So what exposure are you assuming?

A. I'm assuming, under the worst scenario here, that he was exposed at least to one molecule of aflatoxin. That's what I'm assuming. Again, *I am not qualified to talk about a dose response curve with respect to aflatoxin exposure. I think he had ample opportunity to be exposed to aflatoxin based on a general impression that I have and not on toxicologic or scientific method that I can refer to,* I know the potential for that agent to actually interact with DNA directly and precipitate a molecular charge in the DNA which can then be manifest by a tumor being developed. *I know that's possible. I know that he was exposed—* and I don't know the quantity of exposure—over the course of his employment there at the plant. So I would say that I know more than him having one whiff of aflatoxin and then being done with it. I know more than that. But I can't quantitate for you what I think his exposure was over the course of employment. I know he had regular exposure, so it may be a function of having repeated opportunities for exposure over that year and a half period of time. I think that's quite different than saying that he walked into a place and he had one whiff of aflatoxin. But I can't quantitate for you in terms of the number of molecules that entered into this body and interacted.

THE COURT: I'm trying to figure out how the dosage or the quantity is affecting your opinion or would affect it. Are you accepting Dr. Valentine's estimates of dosage? Are they necessary for your opinion? Are you willing just to say that, you know, I understand he inhaled—or at one point you just assumed he ate it.

A. Right.

THE COURT: And were willing to express this opinion. But now you understand he both ate it and inhaled it.

A. Right.

THE COURT: But it doesn't—would he have one bite of cheese and he took one whiff. Is that going to be it? Do we have to have some dosage before which you would not feel you would be willing to make that opinion?

A. I don't want to skirt around the issue. *I can't tell you because I don't know what the dose response curve looks like for this. I also don't know what the dose level was he was exactly exposed to.* I think he had opportunity for—in the same sense that how many cigarettes is a cause to cause cancer? The answer is, well, you know, more cigarettes is going—more smoking is going to increase your risk. Can you get cancer by smoking a single cigarette? Yes, it is possible, but very unlikely. I wouldn't place my opinion in this case on the equivalent of smoking one cigarette. I think he had more exposure than that. But I can't tell you the dose response curve.

THE COURT: In most cases there is a dose response curve.

A. In many cases for environmental exposures there are. But the other think that's different about this case is it is not an environmental exposure. This is an occupational exposure. His opportunity to interact with this contaminant was much greater than it would be somebody living ten miles from an industrial plant that's spewing stuff into the area.

THE COURT: You do understand that people all over the world are working in atmospheres of B1 aflatoxin?

A. Yes.

THE COURT: And so far, as the Court understands, there's never been a documented case of B1 or M1 causing laryngeal cancer?

A. Well, the Hayes article provides evidence against what you just said.

THE COURT: So you would be willing to take that, in other words, in the absence of any other evidence that as a predicate for your opinion. That's what I was trying to get to.

A. Yes.

THE COURT: Absence of other causes that you could attribute, drinking alcohol, so forth?

A. Right.

THE COURT: And Hayes, so that's basically it?

A. That's correct.

Tr. Vol. 3, at 85–89. (Emphasis added.)

Although Dr. Pollock first gave his causation opinion in this case before having even seen the *Hayes* or *Olsen* studies, he later relied heavily on *Hayes* as a predicate for that opinion. In any event, the importance of the *Hayes* study to Dr. Pollock's present opinion is obvious. He describes that study as "an occupational cohort study." And he disagrees with plaintiff's expert Mr. Metzger's view on the statistical significance of that study. But the extent of his opinion appears to be that the *Hayes* study is statistically significant for an increase in *respiratory cancer* as a result of exposure to aflatoxin. The Court accepts this proposition even though the authors of the *Hayes* study make no such claim.[10] Other papers have referred to the *Hayes* study as having "correlated respiratory exposure to AFB to an increased incidence of respiratory cancers." Plaintiff's Exhibit H.

"Respiratory cancers" cover a large number of potential sites. The larynx was not one of those sites in the *Hayes* study. And the study simply did not deal with AFM, the aflatoxin with which we are concerned here and which is much different in its molecular structure, its mutagenicity and its carcinogenicity from the much more potent AFB. The fact is that AFM has never been reported in any literature to be carcinogenic through inhalation exposure.

---

10. The authors state:

"Clearly the small study has not given a definite indication of a cancer risk associated with a largely respiratory exposure to the aflatoxins in an industrial setting." (P. 43 of *Hayes* study.)

Neither Dr. Pollock nor plaintiff's other experts have researched aflatoxins or written about aflatoxins prior to their involvement in this litigation. Dr. Pollock was originally of the opinion that Mr. McDougal's cancer was caused by his consumption of a large amount of cheese which he stated was the most likely contributing cause of his laryngeal cancer. He later abandoned that theory perhaps because the larynx is not readily exposed to swallowed food.

The Court considers Dr. Pollock an excellent epidemiologist and statistician, but, after reviewing his testimony, both direct and cross, concludes that there is no scientific basis for his causation opinion.

## H. Plaintiff's Explanation of Absence of Scientific Literature Supporting His Causation Theory

How do the plaintiff's experts handle the absence of any scientific documentation of their theory that AFM can cause, and has caused, laryngeal cancer? Dr. Teitelbaum provides the following explanation in a colloquy with the Court:

> THE COURT: For instance, in the larynx, is there not some of the same protective devices as the skin, whereas before it gets to the point of where it didn't activate at all, it has to get through this barrier of some type you are talking about?
>
> A. Yes. All that's correct, Your Honor. But we get laryngeal cancer regularly. And we get it because the protections don't work.
>
> THE COURT: You get it regularly, and you know it is caused by, for instance, smoking?
>
> A. That's one of the causes.
>
> THE COURT: Alcohol?
>
> A. That's one of the causes.
>
> THE COURT: Have you ever seen a case that's been documented where it has been caused by aflatoxin?
>
> A. I am not aware that anyone has reported that, except in the Olsen article. And we've talked about the Olsen article. And the Olsen article is epidemiologically a very difficult article to interpret. They used an unusual measure. They have con-

founding problems. There's a question about whether their comparison group is appropriate. But all of those errors would tend to obliterate the difference between the aflatoxin-exposed group and the non-exposed group. Nonetheless, they had more laryngeal cancers in that group than they had in the comparison group. Now, it doesn't reach statistical significance for many technical reasons, which I know Dr. Pollock is going to talk about and others have talked about. I don't think that you want me to waste the time of the Court on that particular issue, although I will discuss them if you think I should.

> THE COURT: Well, I guess, you know, the law has to be I think more practical than theoretical science in terms of dealing with problems.
>
> A. I think the law does have to be more practical.

Tr. Vol. 2, at 47–48.

Then the Court pointed out to him that aflatoxins were not identified until 1960. And yet we know that many people have, in their day to day occupations, over the centuries been exposed to aflatoxin B–1 which is more virulent than aflatoxin M–1. And in the whole medical world we find no documented case of either of these aflatoxins causing laryngeal cancer although it is well documented that aflatoxin B–1 causes liver cancer. Dr. Teitelbaum acknowledges that this was correct. His explanation?

> I think there are several answers which are very relevant. The first answer is that in general laryngeal cancer doesn't kill anybody. It is very rarely it causes death. As a result, it doesn't get counted, because most epidemiological studies, Your Honor, are done on dead people. They are body counts. And because they are body counts, those cancers, like skin cancer and larynx cancer and testicular cancer, which rarely cause death, simply don't turn up in the statistics. That's why Olsen chose to do an incidence-type study rather than a mortality study. There's a beautiful paper by Alvin Feinstein. Alvin Feinstein is professor of epidemiology at Yale University, wrote a paper called "Fraud and Deceit in Epidemiology." He says it is not that

people want to be deceitful or fraudulent, but the fact is that death certificate studies don't reflect disease. So I think that, number one, the answer to your question lies in the fact that laryngeal cancers rarely get counted as causes of death and rarely get counted as diseases which result from particular occupations, because how do we know that diseases are associated with occupation? We go to the death certificates, and we look for the usual occupation. We look for the cause of death, and we match those up. It is not going to work.

Tr. Vol. 2, at 49–50.

### I. Dr. Raymond Harbison's Critique of Plaintiff's Causation Evidence

■ The Court has already set forth the views of Dr. Draughon, see *supra*, but it was also impressed by the testimony of Dr. Raymond Harbison, one of the experts produced by the defendant. He is a professor of environmental and occupational health and professor of pharmacology in the College of Medicine at the University of Southern Florida. He is also the director of the Center for Risk Analysis and Management in the College of Public Health. He received a doctorate of pharmacology and toxicology from the University of Iowa College of Medicine in 1969. He was employed by the defendant to critique and evaluate the evidence offered by the plaintiff's experts. In this connection he reviewed the reports and the depositions of Drs. Tietelbaum, Valentine, Fowler, Mazumder, Pappas and Pollock and he also received the pertinent literature. He concluded that the plaintiff's experts did not utilize a proper scientific methodology in arriving at their opinions.

Dr. Harbison identified certain minimal steps necessary to establish scientific reliability, the first of which is to evaluate the exposure evidence. In this regard he states that the exposure must occur "such that the disease ... is temporally eligible to have been caused as a result of that exposure." And the exposure level must be documented at a level "capable of inducing the known effect." In Mr. McDougal's case the question would be whether or not the exposure would have increased the risk or the likelihood of his getting laryngeal cancer. He states that "the observed effect must be biologically plausible and known to be caused by the agent." And the effect that is alleged must be concordant with the scientific literature or other precedents showing that the chemical caused the effect. An injury to a specific organ must be replicated in a general population upon identical exposure. Then, confounding variables must be eliminated as potential causative factors. Next, one must consider the latency period—the time between exposure and the alleged effect. From what is scientifically known about such latency periods a conclusion can be drawn as to the plausibility of the putative cause. Next, there must be some demonstrated effect of the chemical on the target cells. Under this regime one would next need a consistent pattern of identical effects to be demonstrated under control circumstances. Finally, epidemiologic and bioassay tests must be supportive of the biological plausibility of that effect.

According to Dr. Harbison this regime to provide scientific reliability was first known as Koch's Postulates, then the Koch–Henle Postulates and more recently as the Hill Criteria.

Dr. Harbison then analyzed the Plaintiff's evidence under that protocol. He first dealt with potential exposure. He noted that Dr. Mazumder tried to model what level of aflatoxin would be found in the milk mist. He then compared the dose that Dr. Valentine ultimately calculated to the dose of aflatoxin that one would get as a "result of exposure to milk anywhere or to peanut butter anywhere, or to food anywhere." He concluded:

> The risk associated with the consumption of that level of aflatoxin is about one in a million meaning that if you consumed that amount of milk for a lifetime, that is if a million people did, there may be one excess cancer in a million people in a lifetime. That is the highest it would be. In fact it could be zero.

Dr. Harbison was looking at the figures calculated by Dr. Valentine to determine if the exposure of Mr. McDougal was greater than the normal exposure to aflatoxin in order to

determine whether or not there was an excess risk. He concluded:

> I could not determine that there was an excess risk from that 15 month exposure, again remembering that exposure is only the opportunity for contact, that there was an excess risk versus the other sources of aflatoxin that Mr. McDougal would get.
>
> The [routes] of exposure might be different. That is, you eat food, and you would inhale the fog or the mist. But generally what I did is I looked at the dose. So I couldn't find an excessive risk, and therefore you could not conclude, in the absence of an excessive risk, that there was any likelihood that, in fact, that cancer was caused as a result of exposure to the aflatoxin, because you couldn't eliminate the other sources of aflatoxin.
>
> Q. That's not even considering other carcinogens?
>
> A. That's not even considering other carcinogens. That's just looking at the aflatoxin.

Tr. Vol. 4, at 100–01.

Dr. Harbison then discussed his views on differential diagnosis and the elimination of confounders:

> A. Next I looked at the other possible causes, confounders or other substances that could potentially cause or increase the risk of cancer of the larynx. For example, I believe that Mr. McDougal's parents were smokers, and also his brother was a smoker. Environmental tobacco smoke or secondhand cigarette smoke is a risk factor for lung cancer. Now, that risk for laryngeal cancer has not been reported. But it is a risk factor for lung cancer. So there is at least another potential risk factor for laryngeal cancer with regard to Mr. McDougal.
>
> Q. That's right in his history. You as well as the other experts could look at his history and see that, right?
>
> A. Yes, sir. Now, also, of course, there is exposure to many other carcinogens, other than just aflatoxin. So, to focus only on aflatoxin, as though it were the only substance to which he was exposed, is not really very reasonable.

THE COURT: Let's do that for a moment. Earlier you said that he could have been exposed to other aflatoxins?

A. Yes, sir.

THE COURT: What's the basis for your conclusion that he may have been exposed to other aflatoxins?

A. Aflatoxins are found in other foods. For example, it is found in peanut butter. The risk of cancer associated with eating four tablespoons of peanut butter on a daily basis is about 1 times 10 to the minus 6, again, one excess in a million people in a lifetime. Aflatoxins are also found in grain and are found in other foods, so cereals, other grain products can also have aflatoxins in them, for example, peanuts, not just peanut butter. So there are other sources, potential sources, of aflatoxin.

THE COURT: If you get a bottle of peanut butter, jar, will you have aflatoxin in it?

A. I can't say that you will. You may. In 1998, 1997, the frequency of having aflatoxin in peanut butter is probably not very great. But it could certainly potentially be there. In some of the peanut butter, there will be aflatoxin. The percentage changes depending on the production, the year. FDA does what it calls a market basket survey annually. It will go out and collect peanut butter from all over the country.

THE COURT: Would there be any difference between, say, 1990 and 1997?

A. There might be in the percentage.

THE COURT: There's information published about this from year to year?

A. Yes, sir.

THE COURT: Go ahead.

A. Other carcinogens, for example, this morning I heard discussion about polycyclic aromatic hydrocarbons. Polycyclic aromatic hydrocarbons are constituents of second hand cigarette smoke. They are also usually in urban air; that is, in cities such as Batesville. If you charbroil food, you will be exposed by inhalation to polycyclic aromatic hydrocarbons. Even some medicinals, like shampoo, dandruff shampoos, for example, have polycyclic aromatic

hydrocarbons in them. Our public drinking water supplies, whenever you chlorinate a drinking water supply, you will produce chloroform. Chloroform is also a carcinogen, so you could calculate a risk of cancer based upon consuming two liters of water a day from a public drinking water supply. So there are many other sources of exposure to carcinogens in one's daily life, so it would be difficult to eliminate all of those other sources. But I think all of those other sources need to be considered when evaluating either the risk or the likelihood of laryngeal cancer or any other cancer occurring as a result of exposure to those substances.

And with regard to biologic plausibility Dr. Harbison testified:

With regard to the biological plausibility of the aflatoxin causing the laryngeal cancer, there has been no previous report of that occurring in either laboratory animals or in man. And carcinogens produce carcinogenicity in specific organs or target organs or tissues of the body. And they produce the cancer in that specific organ or tissue because of either the metabolism or the interaction of that substance with that particular tissue or that particular organ. So I also looked at the likelihood that aflatoxin could cause cancer of the larynx that hasn't previously been reported. And the target organ for aflatoxin is the liver, although there have been some reports of cancer occurring in some other parts of the body, although I think those aren't strong associations. The primary target organ is the liver. In looking at the mechanism of action, it is probably as a result of the conversion of aflatoxin to other substances, which subsequently are the carcinogenic form. So I looked at the mechanism as will and concluded that because there are no reports and because of the enzyme activity in the liver, it is not likely that there would be an effect in the laryngeal tissue as a result of exposure to the aflatoxin in the mist.

Based upon all of that information and those reviews, looking at the scientific literature, it would be my opinion that neither Dr. Valentine or Teitelbaum used an appropriate scientific methodology to come to the conclusions that they came to and that there is no scientific basis by which one could come to an opinion that aflatoxin causes laryngeal cancer to a standard of a reasonable scientific probability. So that's the methodology that I went through and used to evaluate the information that I had.

Q. Now, Drs. Pollock and Pappas shared the opinion on of Teitelbaum, perhaps not every opinion he shared, but he one, the fact, the opinion that aflatoxin exposure was a significant factor in the laryngeal cancer. Would your opinions be the same with regard to their work?

A. Yes. I subsequently, after I wrote this, looked at the depositions of Dr. Pollock and Dr. Pappas. And my opinions would be the same.

Tr. Vol. 4, at 103–08.

While the Court does not agree that plaintiffs in toxic tort cases must always follow such a precise protocol as that described by Dr. Harbison in order to establish the admissibility of their causation evidence, it does agree generally with his assessment of plaintiff's expert testimony.

## J. Latency

Even the temporal association of plaintiff's exposure to AFM and the occurrence of his cancer fails to give support for his causation theory.

Each cancer has its own latency period which is the time it takes from exposure until diagnosis. Of course, the period of latency for a particular type of cancer may vary somewhat from one individual to another depending upon the age of the person and other factors. Dr. Pollock testified that, "the two risk factors that contribute 95 to 97 percent of the incidence of laryngeal cancer, cigarette smoking and alcohol, typical latencies for those exposures are on the order of 10 to 20 years." *Daubert* Hearing Transcript Vol. 3, at 115–16.

Mr. McDougal worked at HVF from July 26, 1990, until October 31, 1991. The time of his exposure to AFM has not been established with precision. If one were to assume

he was exposed and received a sufficient dose to start the process on the first day he was employed there, and we know that he was diagnosed on February 27, 1995, then we can say that the maximum period possible for the development of his cancer would be four and one-half years.

Scientists have developed information on "tumor doubling times." Dr. Pollock explains the term: "That's the amount of time required for the number of tumor cells in a tumor to double." Tr. Vol. 3, at 116.

The record indicates that Mr. McDougal's cancer when discovered was 1.9 centimeters in size. The defendant contended that the appropriate doubling times would require 8.7 years for Mr. McDougal's cancer to reach this size. If one were to accept this, that would mean that his cancer must have started in 1986, long before his employment at HVF. But even the defendant acknowledges large variances, and the plaintiff has produced information in Chapter 4 of *Principles and Practice of Oncology*, Devita, Jr., et al., that differs with defendant on the cell doubling time. The parties seem to agree that it would take 31 doubling periods to reach the 1.9 cm. size. They disagree on how many days constitute one doubling time. The defendant uses 100 days. The plaintiff suggested 58 days. Using the 100 day period would yield on 8.7 years latency period. But Dr. Harbison who presented this information for the defendant said he would modify by using ± 20%. This would produce a range of 6.4 years to 9.6 years. Using the 58 day period the basic time for 31 doubling would be 4.92 years. If one used ± 20% this would give a range of 3.95 years to 5.9 years. Dr. Strauss gave a period of 5 to 7 years.

So what conclusions can be drawn with respect to the latency period? The Court concludes that the latency period cannot completely exclude the possibility of Mr. McDougal's getting his cancer by reason of his exposure to AFM while on the job. But the latency data creates one more negative for the plaintiff.

### K. Most Frequently Cited and Argued Studies

There are several articles in scientific journals reporting on studies (dealing with the effects of aflatoxin) that have been the center of controversy in this proceeding over their relevance, or lack of relevance, to the *Daubert* issues. The two articles most frequently discussed are: (1) *Aflatoxin Exposures In The Industrial Setting: An Epidemiological Study of Mortality* by R.B. Hayes, J.P. Van Nieuwenhuize, J.W. Raatgever and F.J.W. Ten Kate, published in 1983; and (2) *Cancer Risk and Occupational Exposure to Aflatoxins in Denmark* by J.H. Olsen, L. Dragsted and H. Autrup, published in 1988. These articles have been referred to as the *Hayes* study and the *Olsen* study throughout this proceeding. Although they have been referred to elsewhere herein, it is important to review these articles in some depth.

In the *Hayes* study the introductory summary or abstract states:

Abstract—Mortality occurring between 1963 and 1980 in a small cohort (N=71) of Dutch oilpress workers exposed between 1961 and 1969 to aflatoxins primarily via the respiratory route was assessed and compared to that of a similar group of unexposed workers (N–67). For the entire period of study the observed mortalities for total-cancer and respiratory cancer were higher than expected in the aflatoxin-exposed group. Mortality observed in the comparison group was within the expected range. While two deaths in the exposed group were attributed to non-malignant liver disease, no primary liver tumors were observed. The greatest difference between observed and expected mortality was in the period between 1963 and 1968.

In the introduction to the *Hayes* study we are told that aflatoxins are a group of lactones and lactone derivatives produced by a group of saprophytic fungi known as "aspergillus flavus." If temperature and humidity conditions are right these fungi grow on grains, seeds and a wide range of foods such as peanuts and corn. Aflatoxins have produced acute hepatotoxic effects in several animal species. The article reports that outbreaks of toxic hepatitis in humans with high rates of mortality have been observed in India and Kenya. In addition aflatoxins are known carcinogens. Studies have revealed

that orally administered aflatoxins are reported to be hepatocarcinogenic in at least eight species of test animals including non-human primates. It is further noted that carcinogenic effects in mice have only been demonstrated following intra peritoneal administration of aflatoxin to neonates. In addition to aflatoxin-induced hepatic tumors a wide variety of tumors at other sites has been reported to be associated with experimental aflatoxin exposure. Renal colonic and gastric cancers, have been reported in rats following oral exposure, while biliary tract pancreatic osteal tumors have been reported in higher primates. More important, for our purpose, the study notes, "following intratracheal exposure in rats squamous cell carcinomas of the trachea as well as hepatomas were reported," citing an article by *Dickens, et al,* in 1966. It is then stated that a range of factors including nutritional and possibly viral factors, "may play a role in the pathogenesis of aflatoxin-related disease."

The introductory notes then turns to the evidence with respect to humans:

> In man, evidence for the association of cancer with aflatoxin exposure has been largely indirect. Primary liver cancer mortality is much higher in certain regions of Africa and the Far East than in Western European countries. Several ecological studies (Keen & Martin, 1971; Oettle 1964; Peers & Linsell 1973; Shank, Bhamarapravati, Gordon & Wogan, 1972; Tuyns, Loubiere & Duvernet-Battesti, 1971) have suggested that in these countries there may be a correlation between aflatoxin contamination of certain food stores and the occurrence of liver cancer in the population. More recently, a case-control study (Bulato-Jayme, Almero, Castro, et al.1982) in the Philippines has indicated that aflatoxin and alcohol when consumed concurrently, can act synergistically in the development of primary liver cancer in man. The possible association of liver cancer in these geographical regions with hepatitis B virus exposure (Falk.1982) may however complicate the inferences to be drawn about an aetiological role for the aflatoxins.

The *Hayes* introduction notes that the issue of the health risk associated with occupational exposure to aflatoxin-contaminated foodstuffs has received little attention. To make the point the authors could only find case reports on two Czechoslovakian chemical engineers who had worked on a method for sterilizing peanut meal contaminated with Aspergillus Flavus and who were reported to have died of pulmonary adenematosis, and a similar report on two British biochemists who developed adenocarcinomas of the colon after exposure to purified aflatoxins.

The need to determine the associated risk of specific forms of cancer in man particularly in relation to aflatoxin exposure via the respiratory route motivated the *Hayes* study. That study built upon an earlier study by Nieuwenhieze, *et al* which was reported in 1973. That original study is then described. It noted that cancer was responsible for 62% of the deaths in the exposed group and 33% of the deaths in the comparison group. The weakness of the original study and the objective of the *Hayes* study itself were then stated:

> The exposed and comparison groups were small and the follow-up was probably too short to assess the full carcinogenic effect of exposure to aflatoxins. Also, the study was initiated in response to an already observed high incidence of cancer deaths which limits the ability to draw statistically valid conclusions from the results.
>
> More than 18 years have passed since the initial exposure of the study cohort. The present study was undertaken to assess up to 1980 the risk of mortality associated with previous employment in the study plant and specifically, to determine whether the reported increased risk of cancer (van Nieuwenhuize, Herber, de Bruin, et al 1973) would be substantiated and whether this risk would be associated with tumors at a particular site, such as the liver.

The *Hayes* study identified the records of 71 workers in the original study employed in the plant for two or more years during the exposure period, and also identified the records for 67 comparison plant workers. *Hayes* also determined the number of weeks each of the workers was exposed to the

aflatoxin. Then the researchers obtained the death records of all workers in both groups that had died by 1980. The mortality data were analyzed using Standardized Mortality Ratios ("SMR"). As explained in the *Hayes* report:

SMRs were calculated s the ratio (×100) of the observed to the expected number of deaths, with the expected number of deaths calculated from the age (5–yr) and cause-specific mortality rates for Dutch males for the appropriate time (5–yr) periods. The expected numbers of deaths were accumulated for the period from 2 yr. After initial employment (at least 1963) to the year of death or, for those not deceased, to July 1980. For the purpose of these calculations, the comparison-plant worker lost to follow-up was considered to be alive in July 1980. Confidence limits were derived for the SMRs assuming that the observed deaths were randomly distributed from the Poisson distribution (Armitage, 1974).

The "Results" section of the *Hayes* study provides the following information:

For the entire study period, there were 16 deaths due to cancer in the aflatoxin-exposed group and seven in the comparison group.

Seven cancer deaths were ..... in the aflatoxin-exposed group between 1963 and 1968. During this period there was also one death resulting from a clinically undefined liver disease with ascites and one death as a result of acute toxic hepatitis, also of undefined origin. In the period 1969–1980 nine cancer deaths were observed in this group.

In the comparison group two deaths due to cancer were observed between 1963 and 1968 and five cancer deaths were observed between 1969 and 1980. No deaths in the comparison group were associated with liver disease.

\* \* \* \* \* \*

For the aflatoxin-exposed group the observed mortality is higher than expected for all causes of death over the entire study period. This is largely attributable to the higher observed mortality due to cancer. Also, for the periods 1963–1968 and 1969–1980 there is a higher observed mortality due to cancer although only in the first period do the confidence limits (95%) exclude an SMR of 100.

The increased risk of respiratory cancer in the aflatoxin-exposed group is similar to the increase shown for total cancer for the total period of study and for the separate periods. However, this increased risk marginally excludes an SMR of 100 only for the total time period of study. No similar increased risk of death was shown for the comparison group.

The "Discussion" section of the *Hayes* study contains important information and assessments by the authors:

The results of this follow-up study indicate that the observed mortality due to cancer was higher than expected for the aflatoxin-exposed workers through-out the entire period of study. The tumors identified were a variety of sites but the extent to which the development of tumors at these individuals sites was associated with aflatoxin exposure could not be directly determined from this study. However, the association of tumors at more than one site with aflatoxin exposure is consistent with experimental evidence.

Almost half of the cancer deaths identified in this study occurred within a short time of initial exposure to aflatoxins: several occurred within 10 yrs. Similar findings were reported in the other available case reports (Deger.1976: Dvorackova.1976). Considering that there is generally a long latent period between exposure to a carcinogen and the development of cancer in man, these findings of an apparently short latent period could be, at least in part, artefactual. Further investigation of the mechanism of aflatoxin carcinogenesis and more extensive epidemiological studies will be necessary to clarify this point.

\* \* \* \* \* \*

Of the factors, other than aflatoxin exposure, that may have contributed to the higher incidence of respiratory cancer in the aflatoxin-exposed group, cigarette smoking and other occupational environmental exposures are probably the most

important. Although individual smoking histories were no longer available for this study, the original investigators (van Nieuwenhuize, Herber, de Bruin, et al.1973) found no difference in smoking habits between the two study groups. Nevertheless, it should be noted that the increased risk for cancer in the aflatoxin-exposed group can be attributed largely to cancer sites at which tobacco smoking may play an important role.

\* \* \* \* \* \*

A further point worth considering is the possible exposure of the comparison-plant workers to aflatoxins. Corn dust particles may be contaminated with aflatoxins (Sorenson, Simpson, Peach, et al.1981) and any such exposure would result in a underestimate of the difference in cancer risk between the two study groups.

The *Hayes* study concludes with following observations:

> Our major interest in this study was to define more clearly the relationship between aflatoxin exposure and its effects upon the hepatobiliary system in a particular population. No primary tumors of the liver were found among the aflatoxin-exposed workers. Only one tumor of the gall bladder and bile ducts was reported. Two individuals died as a result of non-specific liver disease, one in 1964 and one in 1967. Of further interest is the occurrence in this small study group of seven deaths due to tumors of the respiratory system, including two tumors at exceptionally rare sites. On the basis of national mortality statistics, less than 0.05 cases of either tumors of the nasal cavities or of the pleura would be expected in this study population. Considering a possible mechanism of aflatoxin-related respiratory carcinogenesis. Baxter, Wey & Burg (1981) suggest that the adsorption of the carcinogen onto organic dusts, as in food handling, may provide a potent inflammatory stimulus as well as an effective carcinogenic exposure. Schoental has previously suggested (1967) the hypothesis that aflatoxin-contaminated dust may be a causative factor in the aetiology of nasal tumors.

Clearly this small study has not given a definite indication of a cancer risk associated with a largely respiratory exposure to the aflatoxins in an industrial setting. It is however a unique study and does suggest certain associations which need further investigation.

The *Olsen* study reported on a study of the cancer risk among male employees at 241 livestock feed processing companies in Denmark going back to 1964. The article was published in 1988. It was noted that crops imported for feed production were often contaminated with highly variable concentrations of aflatoxins. It was assumed that workers that unload, transport, store or otherwise handle these dry feed materials may be at increased risk for cancer owing to exposure to aflatoxin B-1. The study paid special attention to the risk of cancers of the liver, biliary tract, and the respiratory system. According to the introduction summary:

> Elevated risks for liver cancer and for cancers of the biliary tract were observed, which increased by two- to three-fold significance after a 10-year latency. Exposure to aflatoxins in the imported crops was judged to be the most probable explanation for these findings, although the influence of lifestyle factors, e.g. alcohol consumption on the results cannot be fully disregarded. Increased risks for salivary gland tumors and multiple myeloma were also detected. However, due to multiple comparisons carried out in this study these new associations must await further confirmation. A decreased risk for lung cancer was observed: despite possible negative confounding due to the smoking habits of the employees, the lung does not seem to be a target organ of the carcinogenic effect of inhaled aflatoxins in humans.

A positive correlation previously had been reported between estimated levels of aflatoxin intake and the incidence of primary liver cancer in several populations. However, only a few studies had been carried out in which the risk for liver cancer was linked to the estimated individual intake of aflatoxin. In this study individual elevated risks were observed for the liver, biliary tract, pancreas

and salivary glands. An increase in the risk of liver and biliary tract cancer had been expected but the increase in salivary gland cancers was significantly in excess of expectancy. One surprising result was that the risk of lung cancer was significantly decreased with 63 cases observed to 85.3 expected. The study points out that the significantly decreased risk of lung cancer in the present study may be explained partly by the fact that the workers in these companies were not permitted to smoke due to the risk of fire. It may also be due partly to a selective recruitment of workers from rural areas who have a low risk for lung cancer. Even though an elevated risk for salivary gland cancer was found, that observation was based upon numbers "too small to allow any definite conclusion." The article concludes as follows:

> Exposure to aflatoxins in the imported feed is the most probable explanation for our finding of an elevated risk for liver cancer and cancers of the biliary tract in this population. Although the increased risks for salivary gland tumors and multiple myeloma may be due to the same exposures, the result remains to be corroborated. Despite the fact that the employees were exposed to aflatoxins primarily via the respiratory tract, a decreased risk for lung cancer was observed; thus, the lung does not appear to be a target organ for the carcinogenic effect of aflatoxins.

From the *Appleton* study, *see supra*, we learned that very low levels of exposure to AFB were needed to start the liver cancer process. It is universally accepted that the principal target organ for AFB is the liver, and we take note that certain organs simply are not targets for certain carcinogens. For instance, the *Olsen* study suggests that the lungs are not targets for AFB. Plaintiff tries to buttress his case for the carcinogenicity of AFM by citing studies of the effects of AFB, suggesting similar potential consequences. But if inhaling AFB is shown to cause liver cancer it appears more logical to assume that AFM would also target the liver, not the larynx. But there has been no empirical data linking AFM even to liver cancer in humans. It is clear that the *Hayes* study provides no support for plaintiff's contention

that aflatoxin M–1 has caused, or can cause, laryngeal cancer.

Dr. Teitelbaum discussed a study to determine whether the particular epoxides for the metabolism of polycyclic aromatic amines and aflatoxin exist in the larynx or upper airways. That study is entitled *Metabolic Activation and and Carcinogen–DNA adduct Detection in Human Larynx,* published in *Cancer Research,* Vol. 54, September 15, 1994. Plaintiff's Exhibit P. He noted that polycyclic aromatic hydrocarbons (PAHs) are found in cigarette smoke. Larynx tissue is known to be a target for cigarette smoking. Dr. Tietlebaum explained that the study had the goal of detecting whether such tissue possessed some particular capacity to activate the carcinogenic substances within cigarette smoke. Cytochrome P–450 is the activating enzyme. And there is evidence that cytochrome P–450 converts aflatoxin into the epoxide form which can then react with the DNA. In plaintiff's "Post–Trial Summary of the Case" filed January 24, 1998, it is stated:

> Aflatoxin is the most potent naturally occurring carcinogen ever discovered. It is converted in the liver, as well as perhaps all tissues in the body and especially in the larynx, to the active epoxide form which then binds to the cellular DNA. As little as one molecule of aflatoxin is capable of causing mutagenicity and cancer. Testimony at the hearing established that the human larynx has more of the enzymes (cytochrome P450) that converts the aflatoxin to the epoxide form than any other extrahepatic tissue (Pl.Exs. P and YY).

The exhibits cited in support of that statement are helpful. Plaintiff's Exhibit P is the article discussed by Dr. Teitelbaum. The Abstract to that article points out that "Putative carcinogen-DNA adducts in human larynx tissues ... from smokers and non/ex-smokers were examined ... and compared with the metabolic activation capacity of larynx microsomes and cytosols from the same tissue. Hydrophobic DNA adducts were evident only in smokers .. which suggested that the adducts may be derived from the polycyclic aromatic hydrocarbons and not aromatic amines." The outcome of the enzy-

matic assays of larynx microsomes "represented the highest level of this P450 yet detected in human extrahepatic tissue. Accordingly, total DNA adduct levels in the larynx correlated strongly with levels of P450 2c, 1A1, and 3A4 but not with P450 2E1 or 2A6." This language forms the basis for plaintiff's statement that the human larynx has more of the P-450 enzyme than any other tissue outside of the liver.

The Court does not see how this finding buttresses plaintiff's case. The Court notes the statement that DNA adducts were evident only in smokers which suggests that the adducts may be derived from exposure to the polycyclic aromatic hydrocarbons, i.e. PAHs in the tobacco smoke. It will be recalled that Dr. Teitelbaum testified that tobacco smoke caused the great majority of laryngeal cancers and that other carcinogens—such as rubber—also caused such cancers because they, too, contained these PAHs. The connection between tobacco smoke and other products containing PAHs and their target, the larynx, is quite overwhelming. Indeed, this article goes on to state in the "Introduction:"

> The mucosa of the larynx is unique from the standpoint of potential exposures to chemical carcinogens. The larynx is the entry to the lung and thus readily exposed to tobacco smoke. Since food rarely reaches the mucosal surface of the larynx, direct tissue exposure to dietary carcinogens is unlikely. On the other hand, alcohol may be expected to reflux onto the larynx mucosa; and alcohol consumption is known to increase substantially the relative risk of smokers to laryngeal cancer.... Conceivably, the surface of the larynx may only be susceptible to carcinogens in cigarette smoke, with alcohol serving as a cocarcinogenic stimulus; thus, studies on DNA adduct detection and on the metabolic activation capacity of the laryngeal mucosa of cigarette smokers may provide a useful model for carcinogenesis in the upper aerodigestive tract.

Plaintiff's Exhibit YY, the other support cited by plaintiff above, likewise appears to favor the defendant more than plaintiff. That article *Cytochrome P-450 and Acetyltransferase Expression as Biomarkers of* *Carcinogen–DNA Adduct Levels and Human Cancer Susceptibility* states at the very beginning of its "Summary:"

> Carcinogen–DNA adducts are generally regarded as relevant biomarkers of carcinogen exposure and their levels in target tissues have often been predictive of tumor incidence in experimental animals. Thus, human risk assessment procedures have utilized dose-response models that assume proportional relationships between carcinogen exposure and cancer susceptibility, even though wide inter-individual variations in human metabolic activating enzymes have now been clearly established. To evaluate these approaches, we have examined the relationship between carcinogen exposure, DNA adduct levels, metabolic activation phenotypes, and cancers of the larynx, urinary bladder, and colon.

> Cigarette smoking is a strong risk factor for cancers of the larynx and urinary bladder. In the larynx, the DNA adducts appear to be derived predominately from polycyclic aromatic hydrocarbons (PAHs) and are evident only in tissue from smokers.

### L. Dr. Pappas' Causation Opinion

■ The Court will briefly address the testimony of Dr. Alex Pappas. As noted in the brief summary of his opinion at Appendix A, Dr. Pappas adds little in the way of underlying scientific support to plaintiff's causation evidence. Essentially, he relies on the work of Drs. Valentine, Teitelbaum, and Pollock, whose opinions the Court has addressed in more detail. Furthermore, he relies on the *Hayes* and *Olsen* studies, which the Court has analyzed in Sections G and K. During his testimony at the *Daubert* hearing, Dr. Pappas stated that there is no threshold for carcinogens and that there is no assumed safe level for such substances. Also, he again relied on the *Hayes* study. In sum, the Court has concluded that a "no threshold" analysis can not provide a valid underlying basis for admissible causation evidence in this case. Moreover, the Court has rejected the other reports and studies upon which Dr. Pappas relies. Therefore, his testimony must also be excluded in this case.

### M. Actual Exposure

 In light of the Court's conclusion that plaintiff has failed to advance admissible evidence establishing that AFM causes larynx cancer at any dose, Mr. McDougal's actual exposure to AFM is not that critical. However, the Court has reviewed the evidence regarding the number of aflatoxin-contaminated milk shipments ("contaminated loads") delivered to HVF, as well as the concentration of AFM in those contaminated loads. Such evidence provides the only factual predicate for determining Mr. McDopugal's actual exposure while working at HVF.

During Mr. McDougal's employment at HVF from July 26, 1990, until October 31, 1991, the defendant shipped an average of more than seven loads of milk per day. The total number of loads exceeded 4,000. Each load averaged 25,108 pounds of milk. According to plaintiff's own proof, less than 5% of the loads had screened positive for any of the contaminants, which included beta lactins, sulfas, and tetracyclines, as well as aflatoxin. The Barrow–Agee Laboratories in Memphis performed the aflatoxin confirmation tests. During the 15 month period only 16 samples of milk from the defendant were confirmed as containing levels of aflatoxin at 0.5ppb or above. But plaintiff's experts arbitrarily assumed a contamination level of aflatoxin at one part per billion in every load shipped by AMPI to HVF. Their calculations of Mr. McDougal's exposure was based on that assumption. Dr. Fowler stated in his deposition:

Q. Thank you. In the last sentence of that paragraph we were just referring to, you begin with, "If the level of aflatoxin in milk is one part per billion." Is the one part per billion an actual level or an assumed level?

A. That's an assumed level because it's a number that's easy to work with that can be scaled up and scaled down depending on the actual concentrations.

Q. Do you know the actual concentration of aflatoxin in any milk that went to Hills Valley Foods?

A. I've looked at some of the information and we've discussed it, but I've not evaluated any of the data for me to speak, you know, to that subject. I mean, I might have an opinion, but Im not sure it's, you know, . . .

Q. Did you—in addition to assuming the level of one part per billion, did you also assume that that level was present in all of the milk being processed at Hills Valley Foods?

A. In the—within the model that I developed, yes. But, again, that is based strictly upon my assumption of one. And, again, the one is arbitrary in this case.

Q. And so if that level is different, then your number would be different, your exposure numbers would be different?

A. And if the number was higher, it'll be higher. If the number's lower, yes, it would be lower.

Q. And if not all of the loads contained aflatoxin at that level, would that change your numbers also?

A. Well I suppose. I mean, yeah, that would be dependent on how much aflatoxin is present.

Fowler Depo. at 50–51.

Dr. Valentine relied on Dr. Fowler's calculations. He testified:

Q. Doctor, help me understand. Are you making the assumption for purposes of your opinion that one load at one part per billion contamination with aflatoxin went to Hills Valley Food or more than one load?

A. No. You asked me a moment ago, I believe, how much I was assuming that that was in those loads. As a matter of reference, I said that one part per billion would be a place where we could start. And in part, I'm basing that on, too, Dr. Fowler's calculations, he assumed one part per billion just for a convenient place to use in the calculations.

Q. What I'm trying to do is find out if one part per billion is reasonable and, if so, why, or if you think it's reasonable, and, if so, why, because we don't know why Dr. Fowler made that assumption just yet? Do you? I mean—

A. No. Well, yes. We talked about it, and that was his—mainly from the mathe-

matical standpoint, it's just easy to work with one, and to do the calculations.

Valentine Depo. at 114–15. Plaintiff's other experts relied to one degree or another upon Dr. Fowler's and Dr. Valentine's work.

It is obvious that plaintiff came into contact with some amount of AFM through inhalation of aerosol particles in processing the cheese. However, based upon the evidence submitted to the Court, plaintiff' experts have in their calculations and assumptions overstated materially the AFM to which Mr. McDougal was exposed.

In this regard the Court generally credits Dr. Draughon's critique of plaintiff's exposure and dose evidence as found in her Report of December 17, 1997, and her testimony. For this reason, and because plaintiff cannot meet the *Daubert* admissibility standards for his causation evidence even if the Court were to accept plaintiff's exposure figures, a more detailed discussion and analysis of the weaknesses and inadequacies of plaintiff's calculations is not warranted.

In his post-hearing summary of his argument the plaintiffs makes the following statement concerning the issue of "Dosage:"

> The *Reference Manual on Scientific Evidence*, Federal Judicial 1994 publication at p. 189 (Pl.Ex.DDD), states there is no threshold for genotoxins, and that the one-hit model explains the response to most carcinogens in that any one molecule of a mutational agent can produce alterations in genetic material. Everyone agrees that John McDougal was exposed to aflatoxin. Although Plaintiffs do not believe it is necessary to calculate a dose of exposure, this has been done by both Dr. Draughon and Dr. Valentine. Dr. Draughon stated that John McDougal was exposed to an average level of 0.31 ppb from 16 documented shipments to HVF and that his overall exposure during this employment was from 0.040 nanograms/week to 0.081 nanograms/week (Def.Ex.A–6, p. 26). Dr. Valentine testified that John McDougal's larynx exposure was from 0.34 nanograms/gram larynx to 0.74 nanograms/gram larynx.

Even if this Court should find that a calculation of dosage is necessary, that has been satisfied through Dr. Draughon and Dr. Valentine. This also satisfies the requirements in *Wright v. Willamette Indus., Inc.*, 91 F.3d 1105, 1107 (8th Cir.1996) which states "We do not require a mathematically precise table equating levels of exposure with levels of harm."

The Court has determined that proof of dosage is necessary in the case, but it does not agree that the calculations of Dr. Valentine or Dr. Draughon would provide an adequate basis for a jury to determine plaintiff's level of exposure or the dosage in this case. First, Dr. Draughon's position is, simply, that even if you accept plaintiff's experts' approach and assumptions, the level of exposure to aflatoxin M–1 that they postulate has not been shown to cause laryngeal or any other cancer in humans. Second, the Court accepts Dr. Draughon's critique of plaintiff's exposure and dosage calculations as accurate. (*See* Dr. Draughon's Report of December 17, 1997, and her testimony). This finding leaves the plaintiff with clear evidence that he was exposed to some aflatoxin M–1 in the aerosol produced in the cheese-making process, but no evidence from which a jury could rationally quantify that exposure in terms of time or amount. Nor has plaintiff even attempted to establish the level of exposure to AFM that would cause his cancer. So plaintiff is really left with his "one-hit" "no threshold" theory.

### N. Summing Up

The Court has exhibited a great deal of hesitation, with consequent delays, in disposing of the defendant's *Daubert* motion, principally because of the excellent credentials of plaintiff's experts. Although the Court is satisfied that it has correctly assessed the admissibility of plaintiff's causation evidence under *Daubert*, it nevertheless recognizes that the process calls upon a lay person—the judge—to assess the scientific validity and reliability of the opinions of the experts produced by the plaintiff. But the Court also has had the benefit of defendant's experts, the presence and absence of scientific literature, and, most importantly, the process itself, which has been guided by able attorneys. Through such means it is possible for

judges to properly discharge their "gatekeeper" duties under *Daubert*.

The burden is on the plaintiff to establish the admissibility of his expert causation evidence when that evidence is challenged in a *Daubert* proceeding. He has failed to carry that burden and therefore defendant's motion to exclude that evidence must be granted.

The plaintiff's experts' causation opinions are not based upon, nor do they reflect, "scientific knowledge." It is true that plaintiff's experts are highly credentialed in their fields. But, as stated by the Ninth Circuit upon the remand of *Daubert:*

> Yet something doesn't become "scientific knowledge" just because it's uttered by a scientist; not can an expert's self-serving assertion that his conclusions were "derived by the scientific method" be deemed conclusive, else the Supreme Court's opinion could have ended with footnote two ... [I]t is our responsibility to determine whether those experts' proposed testimony amounts to "scientific knowledge," constitutes "good science," and was "derived by the scientific method."

Plaintiff's experts have no scientific knowledge or information as to the level of AFM exposure that would subject a person who breathes in a milk aerosol containing AFM to an appreciable, or any, risk of laryngeal cancer.

There are no scientific studies or medical literature that show any correlation between exposure to AFM and laryngeal cancer. Dr. Valentine acknowledged as much in his second deposition:

Q. Doctor, can you show me which of your references in any of your affidavits, including the two new ones that you submitted to us, set forth any studies that demonstrate aflatoxin M1 causes laryngeal cancer?

A. I have no such paper.

Q. Can you give me the citation to any reference or study that has come to the conclusion that aflatoxin M1 causes laryngeal cancer?

A. That does not exist in literature. (P. 31, Line 6–15 of Valentine Deposition, November 8, 1997.)

And the *Hayes* and *Olsen* articles, upon which plaintiff's experts rely in varying degrees, do not support such a finding. See the detailed discussion of those articles, *supra.* Dr. Valentine testified:

Q. Doctor, did any of the authors, did the authors of any of these five studies or articles reach the conclusion that aflatoxin—I'll ask M1 first then B1, but aflatoxin M1 caused laryngeal cancer?

A. Aflatoxin M1 was not covered in any of these studies.

Q. Now, did the authors of any of these studies reach the conclusion that aflatoxin B1 caused laryngeal cancer?

A. There was a suggestion that there was—in the study listed under item number five and the study in Denmark that there were ten cancers of the larynx observed in that particular study. (P.36, Lines 1–10)

Q. Doctor, do you find statistical significance in the number of cancers observed on Table 2 and the expected?

A. I didn't say in my affidavit that I found statistical significance in that. What I said was that the author said there was 1.33 fold increase risk. (P. 38, Lines 19–23) ...

Q. Doctor, whatever you said in your report, this question is not directed to that. I'm simply asking you, do you find the numbers of ten larynx cancers observed versus 7.5 expected as reflected on Table 2 statistically significant?

A. I did not do statistical significance on this nor did the authors of this paper.

And Dr. Pappas acknowledged that he could not locate any documented case of laryngeal cancer in humans having been caused by AFM. And so did Drs. Teitelbaum and Pollock.

Plaintiff has not produced evidence from which a reasonable person could conclude that his inhalation of AFM suspended in aerosolized milk probably caused his laryngeal cancer.

None of plaintiff's experts base their opinions on any pre-litigation research on aflatoxin done by them. None are oncologists. None examined or treated the plaintiff. Mr. McDougal's own treating physician, Dr. Ehab Hanna, is an otolaryngologist specializing in neck and head cancers. He was not called upon by the plaintiff to give an opinion with reference to the cause of plaintiff's cancer. He did testify that tobacco abuse and heavy alcohol consumption are the most common risk factors for laryngeal cancer and that these cause the overwhelming majority of such cancers. He also states that such cancers are occasionally due to viral infections. He concluded in his deposition, "These are the known and established causes to my knowledge."

The Court accepts the sincerity of plaintiff's experts. And someday it may be scientifically established that aflatoxin M-1 can, and does, cause laryngeal cancer. However, at this point in time, plaintiff's experts' opinions to that effect must be considered from the legal perspective to represent unsupported speculation and mere subjective beliefs.

As stated in *Cavallo, supra:*

In the final analysis, the opinions of Drs. Monroe and Bellanti are based largely on hypothesis and speculation. This is not to say that the doctors are insincere in their opinions, or that their opinions may not some day be validated through scientific research and experiment. It may well be that the AvJet spill forever "synthesized" Ms. Cavello to petroleum vapors and various other household chemicals. But the published scientific literature and test results simply do not support that conclusion at this time. And the price paid for this seemingly stringent standard of reliability is that, unavoidably, some legitimate injuries will be left unaddressed. See *Daubert*, [509] U.S. at [595], 113 S.Ct. at 2798–99 (recognizing that "in practice, a gatekeeping role for the judge, no matter how flexible, inevitably on occasion will prevent the jury from learning of authentic insights and innovations.") "In short, *Daubert* commands that in court, science must do

the speaking, not merely the scientists." *Cavallo* at Page 761.

The defendant's Motion to Exclude Opinion Testimony of Plaintiff's Experts will be granted, and, as a consequence, the plaintiff's Complaint must be dismissed because of the absence of admissible evidence of medical causation.

IT IS THEREFORE ORDERED that defendant Associated Milk Producers, Inc.'s Motion to Exclude Opinion Testimony of Plaintiff's Experts [11] be, and it is hereby, GRANTED.

IT IS FURTHER ORDERED that Defendant Associated Milk Producers Inc.'s Motion for Summary Judgment [12] be, and it is hereby, GRANTED.

## APPENDIX A

## BRIEF SUMMARY OF PLAINTIFF'S EXPERT'S OPINIONS

### Dr. Malay K. Mazumder

Dr. Mazumder's report is entitled *Generation of Milk Aerosol in the Cheese Making Process,* and is dated September 29, 1997. Dr. Mazumder analyzed the cheese-making process in which Mr. McDougal worked, and he performed experiments utilizing a tent in which aerosol droplets were measured by means of an "Optical Particle Counter." Based upon his analysis of the cheese production process, he concludes that the cheese making process at HVF produces aerosol milk particles which are inhalable. He concluded that the milk aerosol concentration would be 1.6 grams/m.$^3$ He states that "Optical particle counter sampling of the tent air showed the presence of 75 million particles/m$^3$ in the droplet diameter range of 2 to 30 (micro)m." He concluded that the actual concentration could be as high as 100 times greater if there were no "wall losses."

### Charles Fowler, PH.D., CIH.

Dr. Fowler has provided consulting services in both the private and public sectors since 1971. He is an Adjunct Professor in the Graduate School at UAMS and is certified in comprehensive practice by the Ameri-

---

11. Doc. No. 58 and 79.

12. Doc. No. 79.

can Board of Industrial Hygeine. Dr. Fowler's first affidavit is dated June 9, 1997; his second affidavit is dated October 6, 1997. Utilizing Dr. Mazumder's model for aerosol generation in the cheese-making process, Dr. Fowler states *"if the level of aflatoxin in milk is 1 part per billion* ("ppb"), the amount of aflatoxin produced in the aerosol would be 6.47 nanograms per minute." Fowler Oct. 6, 1997 Aff. at 3 (emphasis supplied). In his deposition, Dr. Fowler was asked about this statement. That exchange is as follows:

A. That's an assumed level because it's a number that's easy to work with that can be scaled up and scaled down depending on the actual concentrations.

Q. Do you know the actual concentration of aflatoxin in any milk that went to [HVF]?

A. I've looked at some of the information and we've discussed it, but I've not evaluated any of the data for me to speak, you know, to that subject. I mean, I might have an opinion, but I'm not sure it's, you know . . .

Q. Did you—in addition to assuming the level of 1[ppb], did you also assume that the level was present in all of the milk being processed at [HVF]?

A. In the—within the model that I developed, yes. But, again, that is based strictly upon my assumption of 1. And again, the 1 is arbitrary in this case.

Fowler Nov. 10, 1997 Depo. at 50.

Dr Fowler estimated that approximately 1/3 of Mr. McDougal's exposure to AFM occurred via general room air when the ventilation system was not working, while the remainder of his exposure took place while he was working near the cheese vats. The Doctor stated that the aerosol particles present in the room in which Mr., McDougal worked were of inspirable size and contained all the constituents of milk, including contaminants. He concluded that plaintiff's total exposure to AFM for one day ranged from 3.05 to 1.52 nanograms. His weekly exposure ranged from 15.2 to 7.68 nanograms.

### Jimmie L. Valentine, PH.D.

Dr. Valentine is a Professor of Pediatrics and Pharmacology in the College of Medicine at the University of Arkansas for Medical Sciences (UAMS) in Little Rock, Arkansas. He also serves as Director of the UAMS Department of Pediatrics Toxicology Laboratory at Arkansas Children's Hospital. He has been active in the field of Clinical Pharmacology and Toxicolgy for 28 years and has authored 51 articles in major journals and 8 chapters in scientific books. He also has co-authored 2 books.

Dr. Valentine prepared an Affidavit, dated February 11, 1997; a Supplementary Affidavit, dated June 9, 1997; and a Second Supplementary Affidavit, dated October 6, 1997. Dr. Valentine relies on the affidavits of Drs. Malay Mazumder and Charles Fowler, in which they attempt to calculate actual exposure. He observes that Dr. Fowler assumed a 1 ppb AFM concentration in the milk HVF processed into cheese. *Id.* at 2. Using that assumption, he concluded that Mr. McDougal was exposed to an upper limit of 6.2 ng/40 hrs work week. At the end of his Second Supplementary Affidavit, Dr. Valentine restated the "scientific facts upon which [his] opinion is based." Quoting, those facts are:

A. Laryngeal cancer is unknown in young men like Mr. McDougal.

B. Mr. McDougal had no known risk factors for laryngeal cancer, *viz.*, smoking or excessive consumption of alcoholic beverages.

C. The length of time (referred to as the latency period) from Mr. McDougal's exposure to milk aerosols containing aflatoxins to his development of laryngeal cancer matches that of an epidemiological study demonstrating a significant increase in airway cancer in workers exposed to grain dust containing aflatoxins.

D. Mr. McDougal developed laryngeal cancer because he was exposed *via* an airborne route. This was a necessary conclusion because exposure by the oral route would have been expected to produce gastrointestinal or liver cancer, not the observed laryngeal cancer.

E. Aflatoxins are some of the most potent cancer-causing agents known.

F. Mr. McDougal's exposure had to be estimated because of the following

(1) Hill[s] Valley Foods no longer exists. The plant was closed and the equipment sold. This precluded actual air measurements during the chees-making process.

(2) The aflatoxin levels in the milk aerosols are not reliably available because of the falsification of records by AMPI and Hills Valley Foods employees. Additionally, many of the documents that might help determine some of these levels have been sequestered by the Federal Government because of ongoing criminal investigations.

G. Exposure sufficient to cause airway cancers can be estimated from the Dutch study previously cited for exposure to grain containing a lower limit of 39 ng/45 hrs work week. This was comparable to the upper limit of 6.2 ng/40 hrs work week that I calculated as Mr. McDougal's exposure by allowing for greater bioavailability of the aerosol as compared to the grain dust in the Dutch study. Therefore, a lower exposure from the liquid milk aerosol should achieve the same effective dose as from the grain dust.

Because of the rarity of laryngeal cancer in a man of Mr. McDougal's age, his clinical findings supported my professional opinion that the unusual airborne exposure to the potent carcinogen, aflatoxin M[1], in the milk supplied by AMPI to Hill[s] Valley Foods for use in cheese-making, was the causative factor of Mr. McDougal's cancer. That milk aerosols containing aflatoxin-like chemicals can be generated in very high concentration by the striking action of milk being transferred to a metal container was validated in Dr. Mazumder's laboratory experiments. Therefore, this leads me to the professional opinion that the use of milk containing aflatoxins, and the subsequent exposure of Mr. McDougal to the aerosols produced during the cheese-making process was the causative factor in Mr. McDougal's laryngeal cancer.

### Brad H. Pollock, PH.D.

Dr. Pollock is an Associate Professor of Health Policy and Epidemiology in the College of Medicine at the University of Florida. He has been active in the field of epidemiology for 16 years and in the specialized area of cancer epidemiology for 9 years. Dr. Pollock has been published, and he is active in the area of pediatric oncology.

Dr. Pollock acknowledged his reliance on work done by Dr. Valentine, and performed no independent calculation of Mr. McDougal's exposure or the dosage at which carcinogenesis is more likely than not. He opined to a reasonable degree of medical probability that: (1) "The exposure to the aflatoxin described in Dr. Valentine's affidavit was either the outright cause, or substantially contributory to the cause, of John McDougal's laryngeal cancer." and (2) "I also agree that independent of, and in addition to, the laryngeal cancer, that John McDougal has extremely substantial reasons to be concerned that more likely than not, that in the future he is apt to suffer additional cancer both in the region of his throat as well as any other area of his body, all as a result of his exposure to the aflatoxin as set out in Dr. Valentine's affidavit.".

### Alex Pappas, M.D.

Dr. Pappas is a Professor of Pathology and Laboratory Medicine in the College of Medicine and Health Related Professionals at UAMS. He has been published extensively in the areas of toxicology, therapeutic drug monitoring, cancer, and clinical pathology.

Dr. Pappas' June 4, 1997 affidavit provides little detail of the science underlying his opinion, but it notes his review of the work of Drs. Valentine, Teitelbaum and Pollock. He concludes that "to a reasonable degree of medical probability, the most likely cause of Mr. McDougal's squamous cell carcinoma of the larynx was due to Aflatoxin exposure." In his deposition, Dr. Pappas stated that he relied on the *Hays* and *Olsen* articles to support his opinion that inhalation exposure to aflatoxin causes cancer in humans. Pappas Depo. at 19.

### Daniel T. Teitelbaum, M.D.

Dr. Teitelbaum is a practicing medical toxicologist in Denver, Colorado. He teaches

graduate toxicology courses in occupational and environmental toxicology at the Colorado School of the Mines. He is an associate professor of medicine and preventive medicine at the University of Colorado Health Sciences Center.

In his affidavit, Dr. Teitelbaum relies on *Hayes* and other publications. Furthermore, he relies on Dr. Valentine's exposure calculation. Dr. Teitelbaum performed no independent calculation of exposure or analysis of the dosage at which carcinogenesis is more likely than not. He states "In my view, the tumor which was diagnosed in Mr. McDougal and which is well-documented in the pathological reports in his medical chart, was more probably than not substantially caused by or contributed to by his exposure to aflatoxins in the course of his work. I believe this aflatoxin exposure was a significant contributing cause of his disease in the context of our contemporary understanding of multistage carcinogenesis." He concludes that it is his opinion that "a sufficient exposure and adequate latency period expired following Mr. McDougal's exposure to aflatoxins to contribute to the multifactorial, multistage causation of his laryngeal cancer."